IN THE UNITED STATES

COURT OF FEDERAL CLAIMS

HARPER/NIELSEN-DILLINGHAM BUILDERS, )
Plaintiff, )
vs. ) Case No. 05 269 C
THE UNITED STATES OF AMERICA, )
Defendant. )

DEPOSITION OF JEFFREY A. HARPER

San Diego, California

Thursday, June 21, 2007

Reported by:
FRAUKE KUO

CSR No. 6283

JOB No. SD45426A/DC JOB NO: 181577A

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

HARPER/NIELSEN-DILLINGHAM BUILDERS, Plaintiff,

vs. Case No. 05 269 C

THE UNITED STATES OF AMERICA, Defendant.

Deposition of JEFFREY A. HARPER, taken on behalf of Defendant, at United States Federal Building, 880 Front Street, 5th Floor, Room 11, San Diego, California, beginning at 9:33 a.m. and ending at 11:38 a.m., Thursday, June 21, 2007, before FRAUKE KUO, Certified Shorthand Reporter No. 6283.



APPEARANCES:

For Plaintiff:
SANDLER LASRY LAUBE BYER & VALDEZ, LLP
BY: JEFFREY M. BYER
Attorney at Law
402 West Broadway, Suite 1700
San Diego, California 92101
(619) 235-5655

For KCI:
MILLER LAW FIRM PC
BY: TRAVIS A. WYMORE
4310 Madison Avenue
Kansas City, MO 64111
(816) 531-0755

For Defendants:
UNITED STATES DEPARTMENT OF JUSTICE
Commercial Litigation Branch
BY: BONDURANT ELEY
Attorney at Law
1100 L Street, NW
Washington, DC 20530
(202) 616-8254



INDEX


WITNESS EXAMINATION
JEFFREY HARPER

BY MS. ELEY 6

BY MR. WYMORE --

BY MR. BYER --


EXHIBITS


| DEFENDANT | | PAGE |
|---|---|---|
| EX 1 | Bid Proposal - KC1 03331-332 | 13 |
| EX 2 | Total Billed Summary Sheet - KCI 01222-241 | 14 |
| EX 3 | Harper/Nielsen Contract | 17 |
| EX 4 | Contract Progress Schedule | 18 |
| EX 5 | Fax from J. Harper to L. Horniak, 4/1/97 | 24 |
| EX 6 | Statement and Acknowledgement, Standard Contract Between General Contractor and Subcontractor Building Construction | 26 |
| EX 7 | Affidavit of Jeffrey A. Harper | 29 |
| EX 8 | Memorandum for Contract File | 43 |
| EX 9 | Letter from K. Smith to CONS/GCOOK, 9/18/97 | 45 |
| EX 10 | Landscape Maintenance Key Dates | 47 |
| EX 11 | Letter from T. Maino to K. Smith, 12/30/97 KCI 02542 | 50 |
| EX 12 | Letter from P. Olson to J. Bergfeld, 1/23/98 | 52 |
| EX 13 | Site Visit Report - KCI 02601-607 | 52 |
| EX 14 | Amendment of Solicitation/Modification of Contract - Pages 1 and 2 of 23 | 56 |




INDEX (continued)
EXHIBITS


| DEFENDANT | | PAGE |
|---|---|---|
| EX 15 | Amendment of Solicitation/Modification of Contract - Pages 13 and 14 of 23 | 58 |
| EX 16 | Letter from R. Spies to T. Maino, 6/10/98 KCI 00762 | 60 |
| EX 17 | Letter from K. Smith to Karleskint-Crum, 6/24/98 - KCI 01545 | 62 |
| EX 18 | Fax from HND to T. Maino, K. Allen, K. Boutwell, 7/2/98 - KCI 00779 | 63 |
| EX 19 | Claim Documents | 66 |


EXHIBITS FOR REFERENCE

(None)

INFORMATION REQUESTED
Page Line
(None)

REFERENCE REQUESTED

Page Line

(None)

INSTRUCTION NOT TO ANSWER
Page Line
(None)







1d743e1f-01c9-4c40-951a-9c800d51efb0

San Diego, California, Thursday, June 21, 2007,
9:33 a.m. - 11:48 a.m.

JEFFREY A. HARPER,
having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MS. ELEY:
Q Mr. Harper, we've met briefly off the record, but I will introduce myself again for the record. I am Bondurant Eley, for the Department of Justice, and I represent the United States in HARPER vs. THE UNITED STATES. Are you represented by counsel today?
A Yes, I am.
Q Who is your counsel?
A Jeff Byer.
Q And you understand you are under oath?
A Yes.
Q Is there any reason you can't testify truthfully today?
A No.
Q Are you on any medications that might impair your ability to testify?
A No.



Q Have you ever had your deposition taken before?
A Once.
Q I am just going to go over a few ground rules. I am sure you know all these already. If you don't understand the question I ask, please feel free to ask me for clarification. Do you understand that?
A Yes.
Q If you need a break, will you agree to let me know?
A Yes.
Q And since the court reporter is taking down everything you say today, please remember to keep all your responses audible and not respond with gestures, if you can. If someone objects to a question, you should answer it, unless otherwise instructed. Do you understand that?
A Yes.
Q After the deposition is completed, you will have the right to read it, sign it, make any necessary corrections to it. Do you understand that you have that right?
A Yes.
Q And just be advised, to the extent you make corrections, I will have the opportunity to comment on that at any trial in this matter.



A (The witness nodded.)
Q Mr. Harper did you do anything to prepare for this deposition?
A Yes.
Q What did you do?
A I reviewed the folder that I had had, a personal folder, with Mr. Byer.
Q And you discussed this matter with Mr. Byer?
A Yes.
Q Anyone else?
A Yes, my dad, because he is being deposed -- as far as when we are coming down here.
Q Okay. Where do you work currently, Mr. Harper?
A Harper Construction.
Q What is your title?
A President.
Q Have you ever worked for a company by the name of Harper/Nielsen-Dillingham?
A Yes.
Q And is that a company that's different from Harper Construction Company?
A Yes.
Q How so?
A A joint venture was formed for the purpose of building this project with Nielsen-Dillingham.



Q When you say "this project," do you mean the Vandenberg Air Force Base project?
A Yes.
Q And it's known as Capehart Multifamily Housing?
A Yes.
Q And when did the joint venture dissolve?
A Well, joint ventures were formed for each of the projects that we did together over multiple years. So I don't know when it officially ended, to tell you the truth, unless years later.
Q From time to time, as we go through this deposition, I have no doubt I am going to use the term "Harper." When I do that, I mean the joint venture, not Harper Construction. So please understand, when I say "Harper," I mean Harper/Nielsen-Dillingham.
A We use HND.
Q Okay. I will try to use either "Harper" or "HND," but that's what I mean.
A Okay.
Q During what time period was HND in operation?
A For this job?
Q Yes.
A Roughly in the mid-nineties.
Q Okay. Did you have a title at HND?







1d743e1f-01c9-4c40-951a-9c800d51efb0

A Yes. Well, I was senior vice-president of Harper Construction at that time. So I am not sure if I was maybe just project manager for the project there, which was my role.
Q What were your responsibilities?
A I negotiated everything, set up the job, negotiated every subcontract, wrote the subcontracts, and then would make sure that the construction was coordinated and built per the plans and specifications from start to finish.
Q Was the Vandenberg Air Force project a phased project?
A This particular one? I can't remember. There were seven or eight, and some of them were phased.
Q Were you involved in all of the phases?
A No.
Q Do you recall which phases you were involved in?
A Yes.
Q Which ones?
A I, II -- And then I believe we negotiated most of the contracts on III and IV, but I wasn't involved in all the construction on III, IV, or after.
Q So your role on -- Focusing just on Phase III: Your role was limited to negotiating the contract?



A And then a certain part of the construction, I can't remember, quite honestly, if it was halfway through, or something, when I got called to Pearl Harbor for many years.
Q I am going to show you a number of documents. And if you haven't seen them before, please just feel free to let me know.
A Okay.
Q Did there come a time when you retained -- when Harper retained a landscaping subcontractor to assist on Phase III?
A Yes.
Q Who was that landscaping subcontractor?
A We referred to them as KCI.
Q Had Harper/Nielsen ever worked with KCI before the Vandenberg Air Force Base project?
A No.
Q Was KCI Harper's -- was KCI HND's regular landscaper?
A No. We hadn't worked with them before.
Q Did you know them by reputation?
A Whenever we go to a -- I'll say "remote area," or a new area -- we kind of canvass the area and find the local subcontractors and solicit bids and check references, and so that's what we did in that area.



Q When you say "that area," you mean in the Vandenberg Air Force base area?
A Yes, central California.
Q And Harper/Nielsen is based in San Diego? HND was based in San Diego?
A Yes. Correct.
Q Did Harper/Nielsen ever work with KCI after the Vandenberg Air Force Base project?
A This project? Yes.
Q When?
A Phase IV.
Q How about after Phase IV?
A Not that I'm aware of.
Q How did KCI's relationship with Harper/Nielsen-Dillingham end?
A When the contract was completed on Phase IV.
Q Now, correct me if I'm wrong. You mentioned earlier that you had worked on Phase II of the Vandenberg Air Force Base project as well.
A Yes.
Q Where was Phase II relative to Phase III, speaking in terms of the physical layout?
A It's nearly adjacent to it.
Q Is Phase III visible from Phase II?
A Yes.



Q Did there come a time when KCI submitted a bid on Phase III?
A Yes.
Q Were they already working for you on Phase II?
A No.
Q Was the bid for Phase II, III, and IV?
A No.
Q And what was the nature of the bid you received from --
A Just for Phase III.
Q At the time when KCI submitted its bid for Phase III, had Harper already begun construction in that area?
A I don't recall that. I don't know.
Q Okay. To the best of your knowledge, did any employee of KCI walk the Phase III site before they bid on the job?
A I don't know.
Q Do you recall whether you ever received any inquiries from KCI, prior to the time it bid on Phase III, regarding Harper's progress on Phase III?
A I don't recall.
Q Okay.
(Defendant's Exhibit No. 1 was marked for identification by the court reporter.)







1d743e1f-01c9-4c40-951a-9c800d51efb0

BY MS. ELEY:
Q Have you ever seen Exhibit 1 before?
A I don't recall specifically. I see hundreds and hundreds of bids, but --
Q Is Exhibit 1 a document of the type that Harper/Nielsen would have received in the regular course of business?
A Yes.
Q And what is Exhibit 1?
A Looks like their estimate or proposal to do the work at Vandenberg, Phase III.
Q And did Harper/Nielsen typically rely on bid proposals such as this?
A Yes. That's our normal modus operandi.
Q And do you have any reason to doubt that the lump sum bid on this proposal was, in fact, $789,665?
A That's what this says, and that's what it appears to be.
Q Okay.
MS. ELEY: We will we mark Exhibit 2.
(Defendant's Exhibit No. 2 was marked for identification by the court reporter.)
BY MS. ELEY:
Q Have you ever seen Exhibit 2 before?
A No, not that I recall.



Q Exhibit 2 is not something you would have received in the regular course of business?
A No. Not this detail, no.
Q Just a few questions on Exhibit 2, however. Do you recall the total duration of calendar days that the Phase III was supposed to take originally?
A No. No, I don't.
Q If I could direct your attention to the bottom of the page, which states, "Our work will go in three increments, January/February 1997, May/June '97, October/November '97." Do you see that?
A I see that.
Q To the best of your knowledge, did anyone from Harper ever tell anyone from KCI that KCI would be able to start the Phase III project in January of '97?
A I have no idea.
Q Are you familiar with the kind of weather that Vandenberg Air Force base experiences?
A I am now.
Q Does the area around Vandenberg Air Force base experience a rainy season?
A Yes.
Q During what months does the rainy season occur?
MR. BYER: Objection; lacks foundation, calls for speculation. You can tell her what you know.



THE WITNESS: I remember the RFP, which kind of tells you, I believe, to expect certain amount of rainfall.
BY MS. ELEY:
Q What's the RFP?
A I am using it for that, but the government specification.
Q Okay. Do you recall which months were identified as months for heavy rain?
A December through March is what I recall -- up in that area.
Q In your experience, do you -- have you found that heavy rainfall can affect your construction?
A Yes.
Q Have you found that it can affect landscaping?
A Yes.
Q And when you received -- When you receive, in your business, bids from landscapers, do you expect for the bid to reflect -- do you expect for their bid to take the risk of rain into account?
A A certain portion is usually expected for normal rainy weather for that area.
MR. BYER: Are you saying any contract you are referring to?
MS. ELEY: In any contract.
THE WITNESS: That's how I was answering it.



MR. BYER: Okay.
MS. ELEY: Yes.
BY MS. ELEY:
Q And do you know whether KCI's bid in this case took any amount of rainfall into account?
A I don't know.
Q Do you recall when Harper/Nielsen was awarded the Phase III contract?
A No. Other than the mid-nineties.
Q Would it help refresh your recollection if I showed you the Harper contract?
A Sure.
MS. ELEY: I would like to mark that as Exhibit 3.
(Defendant's Exhibit No. 3 was marked for identification by the court reporter.)
BY MS. ELEY:
Q Have you ever seen Exhibit 3 before?
A Yes.
Q What is Exhibit 3?
A It's our proposal that we turned in to them on July 22nd, the offer date. And then they accepted it, and it becomes a contract -- on the lower right-hand corner, "award date" -- in August of '96.
Q Okay. Does that refresh your recollection that the contract with Harper was awarded in August 1996?







1d743e1f-01c9-4c40-951a-9c800d51efb0

A Yes. That sounds right.
MR. BYER: For Phase III?
THE WITNESS: Yes. And, again, I am sorry. I didn't verify. I am assuming this is Phase III. I don't see Phase III jumping out at me. A lot of times, they themselves don't put it on there. They have the contract numbers, but it says it on this page here, Phase III, where the handwritten dollars are.
MS. ELEY: All right.
THE WITNESS: So that looks right.
MS. ELEY: Okay. I would like to mark this document as Exhibit 4.
(Defendant's Exhibit No. 4 was marked for identification by the court reporter.)

BY MS. ELEY:
Q I am really going to need your help with this.
A Oh, you got my artwork here -- Oh, no. This is their billing. Okay.
Q Mr. Harper, have you ever seen Exhibit 4 before?
A Yes.
Q What is Exhibit 4?
A We are still trying to figure out how the Air Force uses this, but it was a requirement to be turned in on a monthly basis with your billing. They referred to it as a schedule, but it's actually the contract. If I



recall here, the way the Air Force does it, the total contract value is represented in the left-hand column in those 24 line items broken out into percentages for each number value. That's the gist of it on the left side. Then they have us break out those percentages in a timeline continuum similar to a bar chart or schedule. And, as they explained to me, they utilize this, evidently -- the Air Force, that is -- on knowing how much money they are going to need on a month-by-month basis to pay the contractor. So this is their billing method that kind of matches our intended construction schedule. Is that clear?
Q Yes.
A Okay.
Q Did you prepare this document?
A Under the direction of someone in our office, yes.
Q Did you prepare it in the course of -- in your regular course of business?
A Again, we turn it in, as I recall, one time at the beginning, and then the billings that we turn in, as I recall, then are supposed to kind of line up with this. I don't believe we did this every month or whatever, but, yes, Harper prepared this document and submitted it to the Air Force.



Q Do you have any reason to believe that it wasn't submitted on or about October 31st, 1996?
A Oh, I am sure it was.
Q Okay. If I could direct your attention -- Did Harper/Nielsen, in fact, begin on this project in October of '96?
A Boy, I don't recall exactly.
Q If I could direct your attention to -- it appears to be item 21, "Site Work," down in the left-hand column.
A Yes.
Q What does "site work" include?
A Well, that would encompass primarily everything outside the building structure that wasn't maybe itemized up above. Maybe sometimes there was demolition, or something might be on its own. So "site work" would be, typically, roads, landscape, hardscape, street work --
Q Okay.
A -- fine grading.
Q Based on the manner in which you would read this schedule, did you contemplate that the project would be completed by February of '98 as of this time -- as of October '96?
A That would appear to be correct, yes.
Q Okay. And does that mean that you would also have expected all landscaping to be completed by February



'98?
A Yes.
Q Does -- In the -- In the landscaping business, is there such a thing that's known as a maintenance period?
A Yes.
Q What is that?
A Usually, the stipulated time after the acceptance of the landscape, maybe, by the owner for a certain duration, be it 30 days, 60 days, 90, 120. Those ranges are in there and are required for them to mow the grass, prune the trees, fertilize -- "make sure to establish growth," I guess, is a good way to put it.
Q As you look at this schedule, did you contemplate the entire maintenance period would be completed on this project by February '98?
A I don't know that that -- offhand, if that was taken into account, that all maintenance would be done during that period.
Q Does this schedule contemplate landscaping taking place during the rainy season?
A Yes. It would appear to be that.
Q Specifically, during which months?
A Well, this shows landscaping approximately beginning in August and finishing in February or -- I should say "site work" beginning in August, I should say.







1d743e1f-01c9-4c40-951a-9c800d51efb0

BY MS. ELEY:
Q I am asking about the first page, Mr. Harper. I apologize.
A Okay.
Q Do you remember ever telling any representative of KCI, around April of '97, that you were experiencing delays on the project?
A I don't recall.
Q Do you recall when KCI -- when you were awarded the -- when you awarded the subcontract to KCI?
A No. I did it. I don't recall when or anything.
Q Okay.
MS. ELEY: I would like to mark this Exhibit 6.
(Defendant's Exhibit No. 6 was marked for identification by the court reporter.)
(The witness complied.)
BY MS. ELEY:
Q Do you recognize Exhibit 6?
A Yes.
Q What is Exhibit 6?
A Subcontract to KCI by Harper.
Q Was Exhibit 6 prepared in the regular course of business?
A Yes.
Q Does this document refresh your recollection as



to the date on which the subcontract was awarded for Phase III?
A Yes.
Q What is that date?
A Looks like May 6, 1997.
Q And the -- Directing your attention to the small inset paragraph that begins, "02811 Irrigation," is it fair to say that the subcontract with KCI contemplated KCI's performing irrigation work --
A Yes.
Q -- soil preparation work --
A Yes.
Q -- work related to lawns and grasses --
A Yes.
Q -- and work related to planting --
A Yes.
Q -- and landscape maintenance?
A Correct.
Q Okay. If I could direct your attention to paragraphs 7 and 8.
A Um-hum.
Q There is page KCI02240 at the bottom.
A Uh-huh. I mean "Yes."
Q Would you please take a quick look at this paragraph.



A (The witness complied.) Okay. I have read it.
Q Are you the person that had these paragraphs inserted in the subcontract?
A No. This is our normal subcontract. I mean -- I didn't write them, but this is our normal subcontract that we utilize for our projects.
Q Putting aside any discussion you had with your lawyers, from a business perspective, what is the purpose of Paragraph 8?
MR. WYMORE: I am going to object, and I think it calls for legal conclusion and interpretation of the contract documents.
MR. BYER: It does call for legal conclusions. Again, don't include any discussion you had with lawyers. You can't tell her if that was based on legal communications, but you can answer based on --
THE WITNESS: Yes. I haven't had legal communications on this for a while, but it means time, not money.
MS. ELEY: Okay.
BY MS. ELEY:
Q So is it fair to say that these paragraphs contemplate shifting risks on to the subcontractor?
A Yes, in my opinion.
Q Okay. And is that consideration something that was valuable to you -- would be valuable to you as a prime



contractor?
MR. BYER: Objection; vague. You can answer.
THE WITNESS: Well, I believe so, yes.
MS. ELEY: Okay. I would like to mark as this Exhibit 7.
(Defendant's Exhibit No. 7 was marked for identification by the court reporter.)
(The witness complied.)
BY MS. ELEY:
Q Do you recognize Exhibit 7?
A Yes.
Q What is Exhibit 7?
A It is an affidavit that I signed. I don't see the date.
Q It is an affidavit in this case; correct?
A Yes.
Q I would like to direct your attention to paragraph 4 of your affidavit --
A (The witness complied.)
Q -- and to the sentence which states, "Harper never intended to enforce those provisions against KCI."
MR. BYER: That's not what it says. It says, "never attempted."
MS. ELEY: Never attempted. Sorry.
THE WITNESS: Okay.

BY MS. ELEY:
Q If you could take look at paragraph 4, please.
A (The witness complied.) Okay. I have read it.
Q Was it your intent to insulate Harper/Nielsen-Dillingham -- Excuse me. Let me back up.
From a business perspective, putting aside any conversations you may have had with your lawyers, was it your intent to insulate yourself for -- from a claim for money damages from KCI as a result of delays from this project?
MR. BYER: I am going to state a foundation objection, because that assumes that there was a business reason excluded from a legal reason. I think there needs to be a foundation that there was, in fact, a business reason versus a legal reason.
MS. ELEY: All right.
BY MS. ELEY:
Q Was there a business reason that you -- aside from any legal reason or anything you discussed with your lawyers, that paragraph 7 and 8 were included in this subcontract?
A I guess I am a little confused on what --
MR. BYER: I think she is departing from the declaration right now for a minute.
MS. ELEY: Yes.



BY MS. ELEY:
Q Let's just return to the subcontract.
A I am sorry.
Q I apologize.
A Okay.
Q Putting aside any discussions you may have had with your lawyers, or any legal reason, was there a business reason that Harper/Nielsen-Dillingham chose to include paragraphs 7 and 8 in its subcontract with KCI?
MR. BYER: That did not involve advice of counsel.
THE WITNESS: No. I mean, if I can just break it down, the whole subcontract is written at the beginning with counsel, and that's the same subcontract we have used for decades. It's in there, as we are told, to protect us as a contractor, and that's the subcontract that we send out.
BY MS. ELEY:
Q To protect you from what?
A To protect us from any -- Let me see what 7 and 8 said again.
Q Yes. Please. Sorry.
A "People sending in" -- Well, 7 says extension of time. So they are trying to put some time limits on it. And 8 being the fact of -- I mean acts of God, would be -- that would come to light, so we wouldn't be, I believe,



responsible for things that might be out of everyone's control.
Q When you say "responsible," do you mean responsible for money damages?
A Monetarily, yeah.
Q Okay.
A Monetarily.
Q And is it an accurate statement that Harper never intended to enforce paragraphs 7 and 8 against KCI?
A Well, I am a little bit confused about what that question is. I am sorry.
Q If I could direct you to the second sentence of your affidavit.
A I see that.
Q The fourth paragraph of your affidavit, sentence 2.
A Okay. To my knowledge, have we ever enforced -- Again, I'm just trying to understand what this is saying here, because it is unclear in my mind what you are trying to get at.
Q Well --
A We certainly had discussions about what was happening with them and with the Air Force at that time. And so, as I recall, there were unusual events of rain that year, so --



Q Did you ever --
A I am still not --
Q Did you ever tell any representative from KCI that, based on the problems they were experiencing with the rain, KCI would be unable to collect money damages from Harper as a result of the delay?
A I don't recall.
Q Has -- You mentioned earlier that paragraphs 7 and 8 of the KCI subcontract -- again if I mischaracterize, let me know -- are part of Harper standard boilerplate contracts.
A Yes.
Q Has Harper ever tried to enforce either of the -- those provisions against a subcontractor other than KCI?
MR. BYER: Try to enforce? Objection; vague.
THE WITNESS: Yes. I am not sure what you mean. Let's use another word or something.
MS. ELEY: Okay. I was probably a little distracted by the dealings in the affidavit.
BY MS. ELEY:
Q Has Harper ever been presented with a claim for damage from a subcontractor and responded relying on paragraph 8, you are entitled to more time but no money?
MR. BYER: On any project?
MR. WYMORE: On any project.







1d743e1f-01c9-4c40-951a-9c800d51efb0

Page 34

THE WITNESS: There has been no written claim before, but certainly in the act of conducting business, verbal.
BY MS. ELEY:
Q That has occurred?
A Yes.
Q On how many occasions --
A Yes.
Q -- has that ever occurred?
MR. BYER: Objection; vague.
THE WITNESS: Well, you get complaints all the time. People say, "Oh, gee. It rained." You know, "Oh, well," we say, "it rained, let's get out there and get back at it." So during the rainy season, it happens several times, I imagine, on a lot of our jobs.
BY MS. ELEY:
Q And your response is, you get time but no money from Harper?
A Typically, yes.
Q Okay. Have you ever had to -- in any -- in a case -- Assuming there is a court case, have you ever had litigation with any subcontractor, other than KCI, that involved provisions that were similarly worded to paragraph 7 and 8 of this subcontract?
A Not that I recall.
Q Okay. So your communications you were referring

Page 35

to were strictly verbal?
A Yes.
Q Putting -- If I could direct your attention to the last sentence of paragraph 4 of your affidavit --
A (The witness complied.) Um-hum.
Q -- and in particular the last clause, which states, "If they were enforceable under California law was never determined." Putting aside any discussions you may have had with counsel, do you have any reason to believe that paragraphs 7 and 8 are not enforceable under California law?
A No. I have no idea.
MR. BYER: Let me just object, I am sorry, that it calls for legal conclusion. And you can answer.
THE WITNESS: I have no idea.
MS. ELEY: Okay.
BY MS. ELEY:
Q Was Harper/Nielsen-Dillingham a California-incorporated company?
A Again, my dad was the managing partner, so he set that up. I -- I believe so.
Q Did Harper/Nielsen-Dillingham do any projects outside of California?
A Yes.
Q Where?

Page 36

A Hawaii.
Q Anywhere else?
A Maybe Arizona.
Q Okay.
A Nielsen-Dillingham might have been Nevada. That's why I don't know where it was, the Harper/Nielsen -- where is my end of the company.
Q Okay. If I could turn your attention back to the subcontract, Section 02970, under the heading "Landscape Maintenance."
A (The witness complied.) Yes. I'm there.
Q If I could direct your attention to paragraph 1.1.A.
A Uh-huh. Yes.
Q In particular to the phrase that says, "For a period of one full year (90 days after preliminary acceptance) " --
A I am sorry. I don't see that. Oh, okay. 1.A. -- I was at 1.2. -- "period of one full year (90 days" -- Okay. I see it.
Q Okay. Do you recall whether the maintenance period for Phase III was one full year or 90 days?
A No, I don't recall.
Q I know you discussed what a maintenance period is in landscaping. What's a warranty period?

Page 37

A You know, I think that came up on this job. That's a good question. I don't know the specific verbiage of it, but I would believe that it has to do with that the plants, that they have to stay alive, or be in good shape after -- you know, proven to be substantial or will be growing for a certain amount of time.
Q In your experience, is a warranty period different from a maintenance period?
A You know, not really, in my experience. That's why it was interesting -- or confusing on this job with respect to landscape --
Q Okay. If I could direct your --
A -- after reading that.
Q Okay. If you could direct your attention to paragraph 3.1, in particular A. It's on page 2970-2.
A (The witness complied.) Okay.
Q Have you had a chance to look at paragraph A?
A Yes.
Q Putting aside any discussion you may have had with your lawyers, and purely based on your own experience, what is your understanding of the term "substantially completed" as it refers to planting?
A "Substantially completed" would be the majority of all of the contracted work is installed in the ground.
Q Does it have to be healthy? Do the plants that







1d743e1f-01c9-4c40-951a-9c800d51efb0

Page 74

A. Correct.
Q To the best of your recollection, did the government ever suspend work on Phase III?
A. I can't remember on this job, unless it was with the -- in the beginning, the underground storage and the tanks. I don't remember if they stopped us completely or just said to dodge this whole area and maybe work on another area.
Q If there had been a suspension, would Harper/Nielsen have documented it in any way?
A. Well, if there had been a suspension, they would have to issue a suspension of work -- the Air Force would have.
Q Do your ever recall receiving a suspension of work for Phase III?
A. I -- Gosh, I am sorry. We are -- We have a lot of military jobs and stuff. I don't recall on this one. We -- Usually, they are there every day. We are there every day. We have trailers side by side. We are a communicating contractor, not a litigious contractor. We wouldn't -- It wouldn't be unknown that they ask us not to work on a certain area and give us another area to work, or what have you, without demanding to stop work, but I don't recall on this job.
Q Just in terms of your general course of business:

Page 75

When KCI presented its concerns to you about unreasonable acceptance, did Harper, as a matter of practice, communicate those to the government?
A. Yes.
Q And every time?
A. I don't know. I remember, though -- I don't know if it was me or the guys going over and trying to talk with the Air Force and resolve, settle, communicate, try to figure out what the rub was, what the problem was, but there was definitely a rub between the Air Force and KCI.
Q And at any point, did Harper/Nielsen-Dillingham's relationship with KCI deteriorate in any way?
A. With us and KCI?
Q Yes.
A. Well, yeah, from the time of the start of the contract and you have the honeymoon, or whatever, to having difficulties on getting the product done and letting everybody turn the job over and families move in. And it drags on, and, yeah, you start getting after the subcontractor.
Q Okay. To the best of your knowledge, did you or any of your employees ever request that KCI provide free landscaping to Harper, or any of its employees, in exchange for better treatment under the subcontract?
A. No.

Page 76

MR. WYMORE: Objection; relevancy.
MS. ELEY: I would like to take a quick break and then see if I have any follow-up questions.
MR. BEYER: Okay.
(Recess.)
MS. ELEY: Okay. Back on the record.
BY MS. ELEY:
Q Harper -- Harper Construction currently does not maintain any documents that are relevant to the litigation between Harper/Nielsen-Dillingham and KCI -- and -- well, The United States; correct?
A. Correct.
Q And why is that?
A. We pretty much, as a rule, don't keep anything past five years. We do a lot of work, millions and millions. And we have boxes and boxes, and we have a warehouse. And so, when a job is five years old, especially with the military, things come out typically the first year, maybe, maybe two, and that's it. We don't have -- I fill up too many storage areas.
Q To the best of your recollection, when did Harper get rid of materials relating to HARPER/NIELSEN-DILLINGHAM vs. THE UNITED STATES?
MR. BYER: I am sorry. When you are saying --
MS. ELEY: With respect to the request for equitable

Page 77

adjustment.
MR. BYER: Or the whole project? I mean, they are all kept together.
MS. ELEY: The whole project. The whole project.
THE WITNESS: Well, the job would have been done in the late nineties. It would have been -- From my understanding, the materials would have been done -- gotten rid of five years after the project was completed. So -- I don't remember if the project was completed in '98 or '99, and it would have been probably five years after that.
MS. ELEY: Okay.
BY MS. ELEY:
Q Do you believe that those -- Do you believe that Harper got rid of the files to which you just referred before KCI submitted its request for equitable adjustment or after? If you know.
A. I don't know.
Q Okay. Two more questions on an old topic.
A. Um-hum.
Q If I could get you to look back at Exhibits 14 and 15. They are Modifications 6 and 7.
A. (The witness complied.) Okay. I have got them.
Q Let's start with Modification 6, just to be clear. When you accepted the 49-day extension to complete

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

HARPER/NIELSEN-DILLINGHAM BUILDERS, Plaintiff,
vs. Case No. 05 269 C
THE UNITED STATES OF AMERICA, Defendant.

Deposition of RON HARPER, taken on behalf of Defendant, at United States Federal Building, 880 Front Street, 5th Floor, Room 11, San Diego, California, beginning at 1:30 a.m. and ending at 2:10 p.m., Thursday, June 21, 2007, before FRAUKE KUO, Certified Shorthand Reporter No. 6283.



APPEARANCES:

For Plaintiff:
SANDLER LASRY LAUBE BYER & VALDEZ, LLP
BY: JEFFREY M. BYER
Attorney at Law
402 West Broadway, Suite 1700
San Diego, California 92101
(619) 235-5655

For KCI:
MILLER LAW FIRM PC
BY: TRAVIS A. WYMORE
4310 Madison Avenue
Kansas City, MO 64111
(816) 531-0755

For Defendants:
UNITED STATES DEPARTMENT OF JUSTICE
Commercial Litigation Branch
BY: BONDURANT ELEY
Attorney at Law
1100 L Street, NW
Washington, DC 20530
(202) 616-8254



INDEX


| WITNESS | EXAMINATION |
|---|---|
| JEFFREY HARPER | |
| BY MS. ELEY | 6 |
| BY MR. WYMORE | – |
| BY MR. BYER | – |

EXHIBITS

| DEFENDANT | | PAGE |
|---|---|---|
| EX 1 | Total Billed Summary Sheet | 12 |
| EX 2 | Harper/Nielsen-Billinham Contract | 15 |
| EX 3 | Statement and Acknowledgement | 17 |
| EX 4 | Vandenberg Air Force Base - Phase III Military Family Housing Replacement Contract | 22 |
| EX 5 | Claim Documents | 25 |

EXHIBITS FOR REFERENCE
(None)

INFORMATION REQUESTED
Page Line
(None)

INSTRUCTION NOT TO ANSWER
Page Line
(None)




SAN DIEGO, CALIFORNIA; THURSDAY, JUNE 21, 2007
1:30 p.m. - 2:10 p.m.

RON HARPER, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. ELEY:
Q Mr. Harper, I know we met briefly off the record, but let me introduce myself for the record. I am Bondurant Eley from the Department of Justice, and I represent the United States in the matter of HARPER/NIELSEN-DILLINGHAM vs. THE UNITED STATES. Good afternoon.
A Good afternoon.
Q Mr. Harper, are you represented by counsel today?
A Yes.
Q Who is your counsel?
A This gentleman to my right here.
Q Mr. Harper, you understand you are under oath?
A Yes.
Q Is there any reason you can't testify truthfully today?
A No.







ed25d638-37a8-4e9a-b381-0bfea029dac8

Q Are you taking any medication that might impair your ability to testify?
A No.
Q Have you ever had your deposition taken before?
A Yes.
Q I am sure you are familiar with the ground rules, but I will just give you a few.
A (The witness nodded.)
Q If you don't understand a question I ask and have need for clarification, please ask me. If you don't recall, please indicate that that's so. And if you need a break, please also let me know. Do you understand that?
A Yes.
Q In addition, because the court reporter is taking down everything we say, please make sure to keep all your responses audible, and so don't respond with gestures.
A (The witness nodded.)
Q Do you understand?
A Yes.
Q In addition, if someone objects to a question, you should answer it unless otherwise instructed. Do you understand that?
A Yes.
Q At the conclusion of this deposition, you will have a right to read and sign the deposition and make any



corrections that you feel are necessary; however, I can comment on any corrections you make in court. Do you understand that?
A Yes.
Q Did you do anything to prepare for this deposition?
A I met with my attorney.
Q Other than that, did you review any documents?
A No.
Q Did you discuss the matter with any of your employees?
A Yes.
Q Who did you discuss the matter with?
A My son.
Q And that's Jeffrey Harper; correct?
A Although he is not technically my employee, but --
Q All right. Where do you currently work, Mr. Harper?
A Harper Construction.
Q And what's your title?
A Chairman of the Board.
Q Have you ever worked for a company or joint venture known as Harper/Nielsen-Dillingham?
A Yes.



Q And is that different from Harper Construction?
A Yes.
Q How so?
A It's a joint venture of two companies.
Q Is it a fair statement to say that Harper/Nielsen-Dillingham no longer exists?
A Yes.
Q From time to time, as we go forward, I likely will use the term "Harper." When I use the term "Harper," I hope that you will understand that I am referring to Harper/Nielsen-Dillingham, not Harper Construction. Do you understand that?
A Yes.
Q Okay. During what time period did Harper/Nielsen-Dillingham operate?
A Hum -- I have to think about that a moment. Generally, through the nineties into the early 2000.
Q Okay. How long have you been in construction?
A Over 50 years.
Q What was your title at Harper/Nielsen-Dillingham?
A Managing partner.
Q And what were your responsibilities?
A To manage the joint venture.
Q What was the purpose of the joint venture?
A To build projects.



Q Did the joint venture ever work on a project known as Capehart Multifamily Housing at Vandenberg Air Force Base?
A Yes.
Q Did that project occur in phases?
A Yes.
Q Did you work on all phases?
A No.
Q Which phases did you work on?
A I don't recall succinctly. We worked on four or five phases, but there were some other things that we did work on.
MR. BYER: When you are saying "you," are you referring to Mr. Harper individually?
MS. ELEY: Mr. Harper individually, personally.
BY MS. ELEY:
Q Did you personally work on any of those projects?
A No.
Q What was your role with respect to the Capehart Multifamily Housing?
A I was the joint venture.
Q What did that job description entail?
A I don't believe it was a formal job description, but it was managing the finances and hiring managers and --

Q And was this contract prepared in the regular course of business?
A I am sure it must have been, yes.
Q If I could direct your attention to the first page.
A. Is it your recollection that the subcontract contemplated KCI performing work related to irrigation?
MR. BYER: Well --
THE WITNESS: Is this the first page or is this?
MS. ELEY: The first page --
MR. BYER: The first page on the exhibit. I apologize.
THE WITNESS: Yes. It says, "KCI."
MS. ELEY: Okay. Could you read the question back, please.
(The previous question was read.)
THE WITNESS: Do you want me to answer?
MS. ELEY: Yes.
THE WITNESS: Yes.
BY MS. ELEY:
Q Is it your recollection that the subcontractor, KCI, provided -- that KCI, the subcontractor, provided that they perform soil preparation work?
A No.
Q How about work related to lawns and grasses?



A No.
Q Is it your recollection that the contract provided that KCI should perform work with respect to planting materials?
A I don't recall. The contract outlined the provisions what they had to do, and I signed it.
Q If I could turn your attention to paragraph 7 and 8. It's the second long paragraph you have, KCI 2200. Could you take look at this provision.
A (The witness complied.) Okay.
Q Putting aside any discussions you may have had with your lawyer, or any legal reason, and calling your attention specifically to paragraph 8, is there a business reason that you chose to include paragraph 8 in this subcontract -- that Harper chose to include paragraph 8 in this subcontract?
A I think the preparations of contracts, all of them, is at the advice of our attorney, and I generally follow that advice.
Q Okay. To your knowledge, in your -- putting aside any discussion you have had -- putting aside any discussions that you may have had with your attorney, have you -- do you have a position as to whether either of these provisions is enforceable under California law?
A I don't know.



MR. WYMORE: Objection.
MR. BYER: Object. The question calls for legal conclusion.
MS. ELEY: Okay.
MR. BYER: I think he has answered the question.
MS. ELEY: Yes.
BY MS. ELEY:
Q Is there a -- Do you view any business advantage from including a provision such as paragraph 8 in your subcontract?
MR. BYER: Objection.
MR. WYMORE: Objection; asked and answered.
MR. BYER: You can answer to the extent that there is a business reason.
THE WITNESS: I think our attorney advises us to put it in, and we put it in.
BY MS. ELEY:
Q In your opinion, does paragraph 8 contemplate shifting the risk of delay onto your subcontractors?
MR. BYER: Objection; calls for a legal conclusion. The document speaks for itself.
MS. ELEY: You can answer.
MR. BYER: To the extent you have an opinion.
THE WITNESS: I don't know.
MS. ELEY: Okay.



BY MS. ELEY:
Q Have you ever had, in your construction experience, a situation where a subcontractor came to you for money damages and you turned them away on the basis of their contract providing that they were only entitled to an extension of time?
A I don't recall.
Q Did you have an opportunity to review the specifications as to lawns and grasses contained in the Harper/Nielsen contract with KCI?
A No.
Q Did you ever have an opportunity to review the specifications as to plant materials contained in Harper's subcontract with KCI?
A No.
Q Based on your experience, what is a "maintenance period," in landscaping terms?
A A period of time that the government and/or the general contractor is required to maintain the newly-installed landscape.
Q And based on your experience, what's a warranty period?
A Warranty period is a period of time that -- generally speaking -- that a contractor agrees to remedy any shortcomings or -- or failures during a specified

Page 30

know what constitutes the basis for the contention in that sentence, based on your own recollection?
MR. BYER: That the Air Force was deliberately dilatory?
MS. ELEY: Yes.
THE WITNESS: "Dilatory" is an interesting word. I don't recall.
BY MS. ELEY:
Q But you don't recall any discussion as to -- one way or the other as to the Air Force's acceptance of the project?
A No.
Q Okay. If you could take look at page 20, please.
A (The witness complied.)
Q First paragraph at the top of the page, please.
A (The witness complied.)
Q First sentence.
A (The witness complied.)
Q This reads, "The Air Force inspectors evaluate completion based on unreasonable standards and defective landscaping specifications for accepting plants and trees." Do you know to what that sentence refers?
A No.
Q Did you ever have any discussions with anyone regarding whether or not the standards of acceptance

Page 31

imposed by the Air Force were reasonable?
A I do recall minor -- minor discussion I had about -- someone was saying that the Air Force required a certain size of stake to hold up a tree and the landscaper had a different size stake, and they made him replace these after some period of time. And I think it was kind of a, "Why in the world would you do that type of thing?" But, I mean, that's all I recall.
Q Did you ever have an opportunity to view KCI -- the landscaping work that KCI actually did on Phase III?
A I would go by the job. Did I know that was KCI's versus the other five various contractors? I don't recall, but I am sure I did at some point.
Q Did you ever -- But you don't have a recollection of what it looked like; right?
A Well, I remember it looked good.
Q Okay.
A We like to leave everything looking good, so --
Q Do you recall whether this REA was a total cost claim?
A I am sorry. A total cost?
Q Was a claim based on KCI's total cost as opposed to itemized cost.
A No, I don't recall.
Q To the best of your recollection, did the

Page 32

government ever formally suspend work on Phase III at the Vandenberg Air Force Base project?
A Not that I recall, no.
Q Before you certified this REA, do you recall ever seeing any backup data from KCI, in terms of what their costs on the site actually were?
A No.
MS. ELEY: If we could take a brief break. I will see if I have any more questions.
THE WITNESS: Okay.
(Recess.)
MS. ELEY: All right. I don't have any further questions.
MR. BYER: No questions.
MS. ELEY: Stipulation.
MR. BYER: Yes. The only thing I would -- Let's go off the record for a second.
(Off the record.)
MR. WYMORE: So stipulated.
MS. ELEY: So stipulated.
* * *

Page 33

I, RON HARPER, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made such corrections as noted herein, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this ______ day of ______________, 2________, at ________________, ________________.
(City) (State)

______________________________
RON HARPER







ed25d638-37a8-4e9a-b381-0bfea029dac8