154-05-269.04

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HARPER/NIELSEN-DILLINGHAM )
BUILDERS, INC., )
)
Plaintiff, )
)
vs. ) No. 05-269-C
) Hon. Nancy B. Firestone
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )
________________________)

DEPOSITION OF CURTIS BOUTWELL
Santa Barbara, California
Tuesday, June 19, 2007

Reported by:
Marceline F. Noble
CSR No. 3024
JOB No. 923596

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HARPER/NIELSEN-DILLINGHAM )
BUILDERS, INC., )
)
Plaintiff, )
)
vs. ) No. 05-269-C
) Hon. Nancy B. Firestone
THE UNITED STATES OF )
AMERICA, )
)
Defendant. )
________________________)

Deposition of CURTIS BOUTWELL, taken on behalf of Defendants, at 1415 State Street, Santa Barbara, California, beginning at 9:36 a.m. and ending at 3:49 p.m. on Tuesday, June 19, 2007, before Marceline F. Noble, RPR, CRR, Certified Shorthand Reporter No. 3024.

2

APPEARANCES:
For Plaintiff:
MILLER LAW FIRM, P.C.
BY: TRAVIS A. WYMORE, ESQ.
4310 Madison Avenue
Kansas City, Missouri 64111
(816) 531-0755
twymore@mlfkc.com

For Defendant:

DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
BY: BONDURANT ELEY, TRIAL ATTORNEY
1100 'L' Street NW
Washington, D.C. 20530
(202) 616-8254

Also Present:
JAMES R. BEACH, P.E.

3

INDEX


| WITNESS | EXAMINATION |
|---|---|
| CURTIS BOUTWELL | |
| BY MS. ELEY | 7 |


EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| EX-1 | KCI Bid Proposal | 15 |
| EX-2 | Bid Summary Sheet | 19 |
| EX-3 | Contract | 22 |
| EX-4 | Memorandum dated 10/23/96 | 23 |
| EX-5 | Schedule | 24 |
| EX-6 | Subcontract, Phase III | 30 |
| EX-7 | Letter dated 9/18/97 | 60 |
| EX-8 | Landscape Maintenance, Key Dates | 62 |
| EX-9 | Memorandum dated 1/16/98 | 64 |
| EX-10 | Letter dated 12/19/97 | 66 |
| EX-11 | Letter dated 12/30/97 | 69 |
| EX-12 | Letter dated 1/23/98 | 70 |
| EX-13 | Letter dated 2/2/98 | 71 |
| EX-14 | Letter dated 2/11/98 | 73 |
| EX-15 | Site Visit Report | 75 |


4

impair your ability to testify?
A. No.
Q. And so if I ask you a question -- just by way of ground rules, if I ask you a question and I'm not clear, please just ask me to clarify and I will.
Do you understand that?
A. I do.
Q. If you -- if you need a break, please say so.
And since the court reporter's taking down all your responses, just make sure that you don't answer with gestures, but rather answer audibly.
A. Will do.
Q. And if someone objects to a question, you should answer it unless otherwise instructed to do so.
Okay. After this deposition's completed, you'll be asked to review the transcript and make any corrections that you feel are necessary.
Do you understand that?
A. I do.
Q. Did you do anything to prepare for this deposition?
A. No.
Q. Okay. So you didn't review any documents

9

in preparation?
A. Not in preparation for the deposition, no.
Q. Did you discuss this deposition with anyone in advance of coming here today?
A. No.
Q. Let's get started.
Mr. Boutwell, where do you currently work?
A. I currently work for a company called KCI Environmental.
Q. And what is your title?
A. President.
Q. Is KCI Environmental different from Karleskint-Crum, Incorporated?
A. Yes, it is. Completely.
Q. How so?
A. Different ownership. Totally separate company, corporation.
Q. Was there -- did Karleskint-Crum go bankrupt?
A. Yes.
Q. Was there a bankruptcy involved with that?
A. Yes.
Q. Now, from here on out I'm going to use the term "KCI," but I want you understand when I use the term KCI, I mean Karleskint-Crum, Inc., and not KCI

10

Environmental, given that they are different entities.
A. Sure.
Q. So you'll understand what I mean when I say "KCI"?
A. I will.
Q. At some point did you work for KCI?
A. Yes, I did.
Q. During what time period?
A. From approximately, I think it was, January of '94 through, I believe, 2002 or 2003.
Q. And what was your position with KCI during that time?
A. General manager.
Q. What responsibilities did you have in that position?
A. I was in charge of things generally from a business standpoint, mainly office work.
Q. What was the nature of KCI's business during that time frame?
A. Landscape, irrigation and hydroseeding.
Q. Okay. Did there come a time when KCI worked on Vandenberg Air Force Base on a project known as Replace Capehart -- C-a-p-e-h-a-r-t -- Multi-Family Housing?

11

A. KCI was involved in three contracts under that name.
Q. Is that a project that proceeded in phases?
A. Yes.
Q. Was KCI involved in all of those phases?
A. No.
Q. Which phases did KCI have involvement with?
A. Phase 2, Phase 3 and Phase 4.
Q. And is it your understanding that this lawsuit is limited to events surrounding Phase 3?
A. Yes, it is.
Q. How did you first become aware of the Phase 3 project at Vandenberg Air Force Base?
A. Through discussions with Harper/Nielsen-Dillingham we were working on the Phase II contract and were -- became aware that there was going to be additional phases.
Q. Was Phase II the first time you'd ever worked with Harper/Nielsen-Dillingham?
A. Yes.
Q. And did KCI ever work for Harper/Nielsen-Dillingham after the Vandenberg Air Force Base project?
A. Not after the Phase IV contract.
Q. What were the circumstances under which

12

know.
A. We would typically include whatever was in the specifications. I do not recall why 90 days was specified in this particular case.
Q. Okay. Moving on to condition No. 7, which states -- I assume that KCI is not responsible for soil conditions or Acts of God detrimental to healthy plant growth. From a business perspective, and leaving aside any conversations you had with your attorneys on this point, why would -- why, if at all, would that reservation be important to you?
A. It is not uncommon for soil to be contaminated with something that would actually kill plants that were being planted that would be -- come from a source other than -- than us.
Q. In your opinion, would you consider a weather delay to be an Act of God?
A. It depends on the contract and circumstances and the severity.
Q. So in your experience, can landscaping be affected by weather --
A. Yes.
Q. -- particularly rainy weather?
A. Yes.
Q. How so?

17

A. Depending on the extent of the rainy weather, it could actually destroy completely what's in the ground.
Q. When you say "destroy what's in the ground," is that limited to hydroseeding, or does that also take into account planted --
MR. WYMORE: Objection. Compound question.
BY MS. ELEY:
Q. -- items?
MR. WYMORE: Objection. Would you restate that question.
MS. ELEY: Sure. That was a horrible question.
Q. When you say that --
Actually could you read back his previous response?
(Record read.)
BY MS. ELEY:
Q. Okay. When you say "what's in the ground," what do you mean by that?
A. Severe weather could destroy hydroseed that's been hydroseeded on the ground. It can also destroy container plants that would be planted in the ground.
Q. Does Southern California have a rainy

18

season?
A. Can you get closer than Southern California? I think I know what you mean by that.
Q. Does the -- does the immediate area around Vandenberg Air Force Base experience a rainy season?
A. Most of the rain around Vandenberg comes in the months maybe -- in the time period of mid- to late winter through spring.
Q. So if you had to -- if you had to put some months on that, what would you say?
A. Generally December at the early window through, say, March, April possibly, late window.
Q. Okay.
MS. ELEY: I will mark this as Exhibit 2 to Mr. Boutwell's deposition.
MR. WYMORE: Thanks.
(Exhibit 2 marked for identification.)
BY MS. ELEY:
Q. Mr. Boutwell, what does Exhibit 2 purport to be?
A. It's an estimating summary.
Q. Do you know who would have prepared Exhibit 2 at KCI for this project?
A. The estimating department, in this particular case probably Jeff Miura given the

19

Exhibit 1.
Q. Do you think you ever saw Exhibit 2?
A. It's possible.
Q. Is Exhibit 2 something that you would have reviewed in the regular course of business?
A. Probably.
Q. And is Exhibit 2 something that KCI would have maintained in its files in the regular course of business?
A. Generally, yes.
Q. And is this a document that -- do you have any reason to believe that this document was not created around July 1996, as it indicates on the date?
A. I do not.
Q. And do you have any reason to doubt that this bid summary contemplated 480 calendar days to complete the total job on Phase III?
A. There's a line item on the front page that states that.
Q. Okay. And then there's a phrase that says, "Our work will go in three increments, January, February '97, May, June '97, October, November '97." Correct?
A. (No audible response.)

20

Q. I'm sorry. Is that correct?
A. It's -- yes, on the bottom left-hand corner it states that.
Q. Do you know what that plan may have been based on?
A. It may have been based on information provided by Harper/Nielsen-Dillingham.
Q. Were you involved in any -- any discussions or other communications with Harper/Nielsen -- speaking you personally -- where that information may have been conveyed?
A. I don't recall.
Q. And do you have any basis for disputing that the total bid amount for this project appears to have been $795,106.40?
A. This is a proposal workup sheet, so looking at Exhibit 1, those two numbers don't match.
So this is a -- a workup sheet to base a proposal from.
Q. Okay. So if I've misstated -- if I misstate what you've said, please correct me. In effect this Exhibit 2 may be some sort of early preliminary draft that gave rise to Exhibit 1?
A. I wouldn't --
Q. If you know.



A. -- say draft. I would say an estimate workup.
Q. And drawing your attention back to the discussion of work, including proceeding in those increments at the bottom of the page, if -- and -- and taking into account your prior testimony as to what months comprise the rainy season around Vandenberg Air Force Base, if your work proceeded in January, February, '97, it would have taken place during the rainy season; correct?
A. That -- that portion of work that would happen in January and February would be within that window I gave you.
Q. Okay. Do you have any recollection as to when Harper/Nielsen was awarded the contract for Phase III?
A. I've seen it, but I don't recall off the top of my head.
Q. Would it refresh your recollection if I showed you the contract for -- the Harper/Nielsen contract on this project?
A. Sure.
Q. I'd like to mark this as Exhibit 3 to your deposition.
(Exhibit 3 marked for identification.)



BY MS. ELEY:
Q. Does anything on Exhibit 3 refresh your recollection as to when the contract with Harper/Nielsen was awarded?
A. Yes.
Q. And when was that?
A. 27 August, 1996.
Q. Do you have any recollection as to when Harper/Nielsen received a notice to proceed on the job?
A. I do not.
Q. Would it refresh your recollection if I showed you a copy of the notice to proceed?
A. It probably would. I'm not sure if I've seen that particular document.
MS. ELEY: I'd like to mark this as Exhibit 4 to the deposition.
(Exhibit 4 marked for identification.)
BY MS. ELEY:
Q. Do you think you've seen Exhibit 4?
A. I may have.
Q. Does Exhibit 4 refresh your recollection at all as to when they received the notice to proceed?
MR. WYMORE: Objection. Calls for speculation. The client says he may. He doesn't



know if he's seen the document.
THE WITNESS: The document sets forth October 23rd, 1996 --
BY MS. ELEY:
Q. But you --
A. -- in line item 1.
Q. But you have no independent recollection of when?
A. Not specifically. I've seen a lot of documents with this letterhead on them, so --
MS. ELEY: Okay. I would like to mark this document as Exhibit 5.
(Exhibit 5 marked for identification.)
BY MS. ELEY:
Q. Have you ever seen Exhibit 5 before?
A. I've seen something that -- that looks like this. I don't think I've seen this particular schedule. But I've seen something with this -- this kind of a layout.
Q. And if I could draw your attention to entry 24 which says, "Site work" -- actually you probably can't read it very well -- 21. Excuse me.
I may have a better copy of it.
A. Okay.
Q. In your experience, does the term "site

work" include landscaping on contract documents such as this?
A. It may but not always include the landscaping.
Q. What does it generally include?
A. A lot of times it will include grading. It -- it can be a kind of an all-encompassing type of a category for things not considered a structure.
Q. Did KCI and Harper ever develop a schedule in which landscaping was sequenced with other types -- some of the other types of site work you've described?
A. I -- I believe that I have seen a schedule where landscaping was related to other -- other activities, say, fencing or sidewalks. Something that would precede it.
Q. Did KCI keep that schedule that you say you saw?
A. I may have just seen it in the offices of Harper on the jobsite.
Q. Okay.
A. I -- I can't state positively that we had one in our files.
Q. In practice on this project, was Harper/Nielsen doing any site work activities at the

25

same time you were landscaping?
A. Yes.
Q. Can you give me some specific examples of that work.
A. Fencing. That particular one I know of at least.
Q. What effect did that -- did the fencing have on your landscaping work?
A. They were fencing in areas that were completed. They -- they risk maybe accessing an area where we had done some hydroseeding. Typically we would hydroseed after the fencing, so it would be a matter of sequencing right after their -- their fencing to do finish landscaping work.
Q. And do you -- do you remember your work being disrupted by Harper/Nielsen fencing at a time?
A. I can't recall whether it affected our -- our productivity.
Q. Okay. Going back to this schedule and I guess line No. 21, site work, and then there's a dotted line at the bottom of the page that appears to map out months in which this work may have been planned.
Is that correct? I'm not an expert at reading the schedule, so I'm asking you.

26

A. I'm not sure what the dotted line indicates.
Q. The bracketed portions labeled January '97, February '97, March '97, et cetera, does that appear to you to be an attempt -- if you know based on your experience in reading these kind of things -- to map out what -- what months this work was budgeted?
MR. WYMORE: I'm going to object to the whole line of questioning. He hasn't prepared the document. It's calling for totally speculation as to how the document was produced and what it contains.
BY MS. ELEY:
Q. You can answer the question.
A. It appears that with the bracketed lines they've added dates to the dotted line. That would usually -- a line like that and some other numbers at the bottom probably more have to do with percentage complete. Not actually pin it down to any particular work item but as a whole.
Q. And based on what you've said, does it appear to you, at least from this document, that site work had been budgeted to take place up through February of '98?
A. Looking at this schedule, it looks like

27

they -- this document contemplates the last bit of site work being completed early in February.
Q. And when does the document contemplate the first bit of site work being completed -- being started? Excuse me.
A. My interpretation is the first of August.
Q. Based on what you've told me about the rainy season in Southern California, upon seeing this schedule and the way that landscaping -- the landscaping and site work was planned, would that have raised any concerns for you about your ability to complete the project?
A. Can you restate that?
Q. That was a horrible question.
So this schedule appears to contemplate site work in the December '97, January '98 and February '98 time period.
Correct?
A. It contemplates some site work being done during that period, yes.
Q. Given your prior discussion as to the months in which Vandenberg Air Force area receives the most rain, is that of concern -- is that time allotment of concern to you as far as landscaping is concerned?

28

A. Well, it's difficult to say what all they have included and where they have landscaping slotted to be done in that overall site work item.
And -- and in respect to the rainy season, that's -- you know, that time period December through April I talked about, that's when the bulk of the rain that is normally received comes. So --
Q. When you -- when you bid on this project, what months did you think you were going to be performing landscape --
In what months did you think you were going to be performing landscaping based on your recollection?
A. Based on my recollection, I don't -- I don't -- the -- what is that -- Exhibit 2 I think talks about that.
Q. Okay. And -- actually going back to this Exhibit 5 and the period of site work span from August of '97 to February of '98, do you know whether that plan period was intended to encompass a 90-day maintenance period? Speaking purely from your point of view.
A. It may have, I do not know.
Q. Okay. I want to spend some time on the contract -- the subcontract that KCI signed.

29

I'd like to mark this as Exhibit 6.
MR. WYMORE: Thanks.
(Exhibit 6 marked for identification.)
BY MS. ELEY:
Q. Do you recognize what's been marked as Exhibit 6?
A. Yes.
Q. And what is Exhibit 6?
A. It's at least a portion of this -- the agreement that Karleskint-Crum signed with Harper to perform the work on Phase III at Vandenberg.
Q. Do you have -- do you have some feeling that a portion of that is missing?
A. No.
Q. You said it's at least a portion?
A. It's at least a portion. I knew the contract was fairly sizeable, and this could be all of it.
Q. Okay. I just wanted to make sure.
If you could, please turn to the page that's Bates numbered KCI 02243.
A. Yes.
Q. Was KCI's contract with Harper/Nielsen-Dillingham for a total contract of $720,500? Do you have any reason to think that's

30

not accurate?
MR. WYMORE: I'm going to object. Would you restate that --
Total contract for what portion? I think it's an ambiguous question.
MS. ELEY: Oh, okay. I'm going to clean it up a bit.
Q. Mr. Boutwell, do you remember the total contract amount of this subcontract for Phase III of the Vandenberg Air Force project?
A. Well, looking at this document, this -- this document says that at this period of time for the scope of work defined in the document it was $720,500.
Q. If you could just take a quick look back at -- I think it was Exhibit 1, the bid proposal.
A. Yes.
Q. The proposal at that time was for a different contract amount -- appears to have been for a different contract amount.
Correct?
A. Yes.
Q. And what is the amount on the bid proposal?
A. On the bid proposal, the base bid is shown as 789,665.

31

Q. Do you know why the amount -- that amount would change between the bid proposal and the final contract?
A. It could -- could have changed by scope of work changes, deletions, negotiation, things being done by others that were originally contemplated in the original proposal.
Q. Do you have any recollection of the basis for that adjustment?
A. Not off the top of my head.
Q. Continuing to look at these two documents together, do you have a recollection as to when this -- this subcontract was awarded to KCI, Exhibit 5 -- Exhibit 6. Excuse me.
A. It was signed on May 1st of '97.
Q. And --
A. And it was awarded on 4/2/97.
Q. And KCI bid this project sometime back in 1996? Right?
A. Correct.
Q. Okay. So at any time between July of '96 when KCI submitted its bid proposal to Harper/Nielsen-Dillingham and April or May of 1997, did you become aware of any delays to the Phase III project?

32

A. I need to jump back a question or two, if I may --
Q. Okay.
A. -- because I'm thinking that about that that you just asked me.
Q. Okay.
A. One thing that I just happened to see when I looked down talked -- and some difference in your pricing question, item H -- and there could be others, but item H on the contract talks about using a 1668 best products in lieu of grow power plus.
"If grow power plus is requested by H/N-D prior to the start of landscape start, then an additive change order for 15,000 will be written to KCI for the increase."
That's an example and may not be the only one of things that would change the pricing from the Exhibit 1 to this -- this subcontract Exhibit.
Q. That's very helpful. Thanks.
A. I'll have to reask the question I wasn't thinking about yet.
MS. ELEY: Could you read back the last question.
(Record read.)
THE WITNESS: I don't recall off the top of

33

my head.
BY MS. ELEY:
Q. Well, at the time that this subcontract was awarded, April of '97, it may be obvious, but you knew you weren't starting landscaping in January of '97? Correct?
MR. WYMORE: Objection. Leading question.
BY MS. ELEY:
Q. You can answer.
A. That would -- you could assume that.
Q. Okay. Between July of 1996 and April of '97, did you or your employees ever walk the site, the Phase III portion of the Vandenberg Air Force project site?
A. I'm not sure. It's possible, but I'm not sure.
Q. Did there come a time when you became aware that there was any difficulty with removing underground storage tanks on Phase III?
A. Yes.
Q. During what time frame did you become aware of that?
A. I don't remember the specific date. I know it was communicated to us by Harper/Nielsen.
Q. Do you think it was before the subcontract

34

was awarded to you or after?
A. I couldn't say. I'd have to look at some documents, and I'm not even sure what those would be, but --
Q. Did you ever make a determination that the delay in removing underground storage tanks might impact your ability to landscape this Phase III project?
THE WITNESS: Could you read that back.
(Record read.)
THE WITNESS: I believe that at some point in time -- and I'm not sure of the time period -- that -- that we determined that that underground storage tank removal process could and would have an effect on the landscaping.
BY MS. ELEY:
Q. What -- what effect specifically would that be?
A. I -- I know it affected the overall construction schedule and sequencing and interaction on the site between various trades and the general.
Q. Actually, how often were you at the jobsite?
A. Personally I would probably maybe once a month, maybe less frequently, visit the jobsite

35

itself.
Q. When you determined that your job was being impacted by the underground storage tank removal, what actions did it take, if any?
A. -- it would be normal for us to notify the general contractor, our -- our first-line client of any impacts on the site that would affect our work.
Q. Do you know when underground storage tank removal was completed on this project?
A. I -- I don't recall. I've seen it in I think Air Force documents and things over the past years, but I don't recall that date.
Q. Did KCI ever try to modify its contract price based on concerns about the pace of the underground storage tank removal?
A. I know that KCI attempted to get change orders that would include modifying the price for -- for various impacts that -- that the project incurred, that being one of them.
Q. Switching gears somewhat. Back in 1997, at any point did you become aware that a weather phenomenon known as El Nino was slated to hit the Vandenberg Air Force area?
A. We became aware of it when it was

36

happening.
Q. But not before?
A. I don't know that predicting weather to that degree is something you could contemplate very easily.
Q. Practically speaking what -- from a landscaping point of view, what is El Nino's effect?
A. From a landscaping point of view, El Nino's effect can have, and in this case did have, an effect on the weather and the amount of storms, the amount of rain, the amount of wind, the total amount of rain that an area would receive over -- over a period of time.
Q. In advance of entering this subcontract with Harper/Nielsen, did KCI ever ask for more money because El Nino was coming?
A. Not that I recall.
Q. Did it ever ask for more time in advance of entering this subcontract based on the fact that El Nino was coming?
A. Not that I recall.
Q. Did you ever approach the Air Force with any concerns about El Nino and its effect on your ability to landscape?
A. Verbally, yes. During the performance of

37

the project when it was going on, we definitely did.
Q. So if I could get you to look back at KCI page 02243.
A. Yes.
Q. What activities was KCI's subcontract to cover? I'll ask -- was this subcontract -- was KCI's subcontract intended to cover irrigation activities by KCI?
A. Yes.
Q. Was it intended to cover soil preparation activities by KCI?
A. Yes.
Q. Was it intended to cover activities related to lawns and grasses by KCI?
A. Yes.
Q. Was it intended to cover planting activities by KCI?
A. Yes.
Q. And was it intended to cover landscape maintenance by KCI?
A. Yes.
Q. Okay. I'm going to direct your attention a little bit earlier in the contract. It's -- it's Bates -- it's a long page, KCI 02240. And I'd like for you to take a quick look at paragraphs 7 and 8.

38

Have you had an opportunity to review it?
A. Uh-huh. Yes.
Q. Do you recall those contract provisions?
A. Not specifically, but they're there.
Q. Do you recall having any negotiation or discussion with representatives of Harper/Nielsen as to either paragraph 7 or paragraph 8?
A. I don't recall discussing with -- with Harper/Nielsen those specific provisions of -- of our subcontract. We did discuss provisions in the prime contract with the Air Force.
Q. Which provisions were those, if you recall?
A. Relating to extensions, compensation, storm damage, those types of things, that were contained in -- not specifically this subcontract but, you know, in the FAR regulations and those types of things.
Q. If I could direct your attention to 8-B, the paragraph 8-B.
And I would like for you to put aside any discussions you may have had with your lawyers about the legal impact of this provision.
As a practical matter, what was your understanding of what 8-B was supposed to accomplish?

39

MR. WYMORE: I'm still going to object because I still think it calls for a legal conclusion.
BY MS. ELEY:
Q. You can still answer.
A. Sorry. I was paying attention -- what was your question again?
MS. ELEY: If you could read that back.
(Record read.)
THE WITNESS: That's a good question because I don't know that it really accomplishes anything.
BY MS. ELEY:
Q. Do you have any understanding to what the term "extras" means?
A. Yes, I do.
Q. What is that?
A. Generally it will be a reference to change orders, usually additive change orders, where you get more money, more time, more compensation of some -- some type.
Q. Okay.
A. Extra compensation.
Q. Okay. If I could direct your attention to paragraph 8-A --

40

A. Uh-huh.
Q. -- and, again, putting aside any discussions you may have had with your lawyers about the legal impact of that provision, what was your understanding as a practical matter of what paragraph 8-A was intended to accomplish?
MR. WYMORE: And I'm still going to assert the objection that I think it calls for a legal conclusion.
You can answer the question.
THE WITNESS: Practically speaking, I believe it's really a clause to attempt to risk shift by the general contractor.
BY MS. ELEY:
Q. And --
A. To the subcontractor.
Q. Do you -- have you seen that kind of clause in your contracts before?
A. Yes.
Q. And in practical effect, do you view that as an attempt by the prime contractor to give you time but no money?
MR. WYMORE: Objection. Calls for speculation. Calls for a legal conclusion.
///

41

BY MS. ELEY:
Q. You can answer.
A. It's a boilerplate phrase that's contained in most contracts that's generally ignored because it's not enforceable.
Q. Have you ever had anyone attempt to enforce this contract -- this kind of contract clause against you?
A. No.
Q. Okay.
A. As a general contractor?
That's the way that I was answering the question.
When I had a sub myself?
Q. Sure.
A. No.
Q. Okay. As a practical matter, do you think it might be -- just from a practical matter from a business point of view, do you think it might be a good idea to strike out clauses 7 and 8 from a subcontract you sign?
A. Yeah. As a practical matter, I -- I think they shouldn't be in any contract. They're just all really old stuff.
Q. Okay. If I could direct your attention to

42

section 02970, landscape maintenance.
MR. WYMORE: Where is that at?
MS. ELEY: Let me find it.
Q. It's actually not Bates stamped -- oh. Look at XUMU-96-4003.
MR. WYMORE: Okay. Exhibit 1-B?
MS. ELEY: Yes. It's Exhibit 1-B. Excuse me.
Q. It says at the bottom -- it also says at the bottom 02970-1. Okay.
I'd like to address -- direct your attention -- did you find it?
A. Not yet, no. You have too many numbers that everybody was quoting.
MR. WYMORE: I think this is the page, but --
BY MS. ELEY:
Q. This page.
A. 02970. Okay. Gotcha.
Q. I'd like to direct your attention to paragraph 1.1-A, summary.
A. Yes.
Q. Just -- just to clear up, was it your understanding that the landscape maintenance period was to be for one full year or for 90 days?

43

MR. WYMORE: Objection. Compound question.
MS. ELEY: I'll reask.
Q. Based on your own personal recollection, was the landscape maintenance period for the Phase III Vandenberg Air Force Base project intended to be one year -- one full year?
A. No. I -- my recollection is it was -- it was intended to be for 90 days.
Q. Generally speaking, in your experience, have you had contracts that provide for both a maintenance period and a warranty period?
A. Yes.
Q. In your experience, what is the relationship between the maintenance period and the warranty period?
A. The maintenance period is the period of time where we're as a contractor actually onsite maintaining the landscape.
The warranty period is for materials and workmanship for one year generally, after the date of installation.
Q. Okay. If I could direct your attention -- was it -- is it your understanding that this contract was intended to work in the way that you just described also?

44

contained on the plans, which we don't -- I don't know if we have --
Q. But not in the subcontract?
A. But personally I probably could not. I'd have to rely on others to point those specifics out.
Q. Okay. And earlier in your deposition, you mentioned that the acceptance standards for Phase III went above and beyond what was required in the specifications.
Is that correct?
A. Yes.
Q. And how did you -- how did your experience in that regard on Phase III compare to your experience on Phase II and Phase IV?
A. Our experience on Phase IV was identical to the experience on Phase III, which was poor. It really couldn't have been more different than our experience on Phase II where we were able to perform and complete the installation and the maintenance and accepted -- and acceptance under reasonable conditions.
Q. Who was the landscape architect on Phase II?
A. I do not know.
Q. Was Mr. Griswold involved with Phase II?

141

A. Possibly, but I'm not sure.
Q. Was Mr. Griswold involved in Phase IV?
A. Yes.
Q. In terms of Harper quality control personnel, was Mr. Olson involved on Phase II?
A. I'm not sure.
Q. Was he involved on Phase IV?
A. Yes.
Q. Same question for Regan Spies. Does that name sound familiar?
A. Yeah, it does sound familiar. I believe he was on III and IV. I don't recall whether he was on Phase II.
Q. Okay. Earlier in your deposition you said that you don't recall whether the Phase III job was ever suspended. Is that correct?
A. I don't -- I don't remember. It -- it may have been. I just don't remember.
Q. Is there anything you can -- you could take a look at that would refresh your recollection in that regard?
A. Air Force documents saying they suspended it. You know, possibly during that storage tank time period.
Q. And --

142

A. That's what's causing me to think there might have been, but I'm not sure if --
Q. And if there were no documents in the Air Force's -- no Air Force documents indicating that the job was ever suspended, would you have any reason to doubt the job was never suspended?
A. I don't know.
Q. If I could direct your attention back to the Allowable G&A exhibit. It is Exhibit -- what's previously been marked as Defendant's Exhibit 24. And I earlier asked you about what "Labor - RCLS" meant. I just wanted to follow up briefly.
What labor is included in, I guess, what would be labor reclassification on that chart?
A. Accounting and administrative labor.
Q. So not just site labor; right?
A. On this particular chart, no site labor.
Q. Oh, okay.
And if I could direct your attention back to the As-Bid Schedule, which we reviewed a little earlier. It appears to have been previously marked as Exhibit 22 to your deposition. And if you could also pull out what was previously marked as Exhibit 2 to your deposition.
A. Exhibit 2 was the bid summary --

143

Q. Yes.
A. -- sheet?
Q. Yes.
A. Okay.
Q. And I am -- I'd like to direct your attention on Exhibit 2 to the phrase, "Our work will go in three increments, January/February '97, May/June '97, October /November '97."
Do you have any --
First of all, are these increments reflected on the As-Bid Schedule that has been marked as Exhibit 25?
MR. WYMORE: Objection. Question is ambiguous. Exhibit 22.
MS. ELEY: Oh, okay.
Q. Exhibit 22?
MR. WYMORE: Will you restate that question.
BY MS. ELEY:
Q. Are the three increments described at the bottom of page 1 of what's been previously marked as Deposition Exhibit 2 -- do those increments -- are those increments consistent with Exhibit 22?
A. No.
Q. Do you -- do you have any idea why that

144