# MEMORANDUM

**DATE:** 11 Apr 97

**TO:** Contract File

**FROM:** Lenny Horniak

**RE:** Contract 96-C-0046, Replace MFH, Phase III, UST Removal

**CC:** n/a

1. Jacobs Engineering Services was awarded a contract in December 1996, through 30 CES/CECVR, to remove underground storage tanks (UST), associated piping and contaminated soil in the military family housing area identified as phase 3. Jacobs Engineering Services awarded a subcontract to V.P.S. Inc., Ventura CA and they mobilized on Monday, 16 Dec 96. All of their work was to be completed within 30 days or o/a 16 Jan 97. It is now 11 Apr 97 and they still aren't finished. The reason they are taking so long is due to the large quantity of contaminated soil that had to be removed, which was much greater than anticipated. Additionally, we had a greater than normal rainfall in the months of Dec 96 and Jan 97 that impeded V.P.S.'s progress. Capt Harcarik, HQ AFCEE (DSN 240-5523) informed us that ~~that~~ delivery order for that contract went over budget by approximately $500K and they are trying to come up with the extra money. Capt Harcarik stated they wanted closure on the UST removal for phases 3 & 4. They couldn't leave the site contaminated as that would have greatly impacted the construction contractor and would have cost the Gov't a great deal of money in delay costs. Phase 4 went exceedingly well but phase 3 is where the problems were encountered.

2. For instance, they had one tank hole on Gum St. that they had to dig 30 feet deep and still encountered contaminated soil. The readings at this depth indicated 140 parts per million (100 parts per million is allowable). They brought the county in and they signed it off as acceptable because of the low level being at such a great depth.

3. V.P.S. Inc. should be all finished by 15 Apr 97.

Leonard J. Horniak

LEONARD J. HORNIAK
Contract Administrator

DEPARTMENT OF THE AIR FORCE

30TH SPACE WING (AFSPC)

10 ~~5~~ JUN 1998

MEMORANDUM FOR 30 CES/CECE
ATTN: BOB GRISWOLD

FROM: 30 CONS/LGCCB

SUBJECT: Severe Storm Damage, Contract F04684-96-C-0046

1. Attached is Harper/Nielsen-Dillingham's letter, 13 Apr 98, which is in response to our letter of 10 Mar 98, which is in response to H/N-D's letter, 24 Feb 98.

2. H/N-D is asserting that Jacobs Engineering Services, who removed underground storage tanks in Phase 3 but on a separate contract, had a negative impact on their schedule. The following background information is provided:

Jacobs Engineering Services was awarded a Contract Number F41624-94-D-8115, Delivery Order No. 0027, in December 1996 by HQ AFCEE, San Antonio, Texas, to remove underground storage tanks and contaminated soil in the military family housing area identified as phase 3. Jacobs Engineering Services awarded a subcontract to V.P.S. Inc., Ventura CA and they mobilized on Monday, 16 Dec 96. All of their work was to be completed within 30 days or o/a 16 Jan 97, but was actually completed around 15 Apr 97 due to the conditions that Jacobs Engineering Services encountered, which was much worse than anticipated. Large quantities of contaminated soil had to be removed and some tank locations required excavations with depths of 20-30 feet below ground surface. This in itself led to a new requirement to comply with OSHA rule 1541.1, Registered Professional Engineer Work Plan for Shoring.

3. It appears H/N-D is asserting that Jacob's Engineering Services finished their contract 3 months late (Jan 97 -Apr 97) and as a result, pushed H/N-D's landscaping work for Phase 3 into the rainy season. They are requesting monetary compensation, but no amount has been cited.

4. We first need to determine if they are entitled to any compensation. We want you to review the attached documents and any information that you may have concerning this matter. Please provide your written response reflecting your position and your rationale on how you made that determination. Please provide no later than ~~11~~ 17 Jun 98.

5. Question/comments may be addressed to Lenny Horniak, Contract Specialist, at 6-2169.

C.H. PAINTER
Contracting Officer

Attachments:
1. Memo for Record, 11 Apr 97
2. LGCCB Ltr, 3 Apr 97
3. 30 CES/CEVCR Ltr, 5 May 97 w/atchs
4. H/N-D's Ltr, 24 Feb 98
5. LGCCB Ltr, 10 Mar 98
6. H/N-D Ltr, 13 Apr 98 w/atchs

MILLER LAW FIRM
A PROFESSIONAL CORPORATION
4310 MADISON AVENUE
KANSAS CITY, MISSOURI 64111
TELEFAX (816) 561-6361
(816) 531-0755

MICHAEL T METCALF

August 1, 2003

*VIA FEDERAL EXPRESS*
C.H. Painter
Contracting Officer
30 CONS/LGCCB
Bldg – 7015, Section 2A
806 13 St., Suite 2
Vandenberg AFB, California 93437-5226

Re: KCI/Vandenberg
Project No.: XUMU 96-4003
Our File No. 1645.02

Dear Mr. Painter:

Please find enclosed the claim of Harper/Nielsen – Dillingham Builders Venture and Karleskint-Crum, Inc. on the replaced Capehart MFH Phase III, Vandenberg Air Force Base, California Project, Contract No. FO4684-96-C-0046. This claim is being submitted in accordance with 41 U.S.C. § 605(c). Thank you for your prompt attention to this matter.

Please send the undersigned a letter of confirmation upon receipt of this claim.

Very truly yours,

MILLER LAW FIRM, P.C.

Michael T. Metcalf

MTM/rh
Enclosures
painter.drv.07.29.doc

PX 1

## I. Summary of Claim

Karleskint-Crum, Inc. (hereafter "KCI") was the landscape contractor on a housing construction project at Vandenberg Air Force Base in Santa Barbara County, California. After KCI's bid was accepted, but before its contract commenced, the project was significantly delayed due to the fact that the removal of underground storage tanks ("USTs")took considerably longer than originally estimated. This initial and substantial delay had a domino effect. Due to the delay, the project was not completed before the rainy season, as originally expected. To make matters worse, the rainy season in California during the year in question, 1997-1998, proved to be one of the worst in recorded history as a result of the " El Niño" weather pattern. As a result, KCI was forced to reinstall landscaping previously installed, and repair and maintain the project grounds 223 days beyond the initial scope. In addition, the U. S. Air Force (hereafter "Air Force" or "Government") imposed unreasonable contract requirements and impractical standards of acceptance. The extra equipment, labor and materials that KCI needed to complete the project resulted in damages amounting to $770,565.

KCI now submits this claim to the Contracting Officer under the provisions of Federal Acquisition Regulations (hereafter "F.A.R.") 48 C.F.R. § 33.201, and the Contract Disputes Act of 1978, as amended (41 U.S.C. 601-613) (hereafter the "Act"). This claim seeks payment exceeding $100,000 and is therefore certified by the prime contractor, Harper/Nielson, as required by the Act and F.A.R. 33.207.

KCI makes this demand for payment of the sum of $770,565.00, as a matter of right, from the U.S. Air Force under the prime contract and KCI's subcontract for the following reasons:

1. There were delays in completing the subcontracted work which arose from unforeseeable causes beyond the control and without the fault or negligence of KCI OR Harper/Nielson, which caused delays in subcontractors' schedules resulting in damages to KCI;
2. These delays experienced on the project forced KCI to perform work at the height of harsh winter storms and the unusually severe weather of the El Niño rainy season of 1997-1998, resulting in severe storm damage to the installed landscaping, requiring replacement of work previously performed;
3. The Air Force made unreasonable demands before accepting KCI's work in order to extend maintenance of the landscaping well beyond the contract period; and
4. The Air Force imposed an unreasonable wage classification requirement, significantly increasing KCI's labor costs.

## II. Factual Background

### A. The Prime Contract

Harper/Nielson-Dillingham (hereafter "Harper/Nielson" or "Contractor") was the prime contractor on the project known as "Replacing Capehart Multi-Family Housing – Phase III" at Vandenberg Air Force Base in the County of Santa Barbara, California (hereafter Phase III). The contract for Phase III (contract No. F04684-96-C-0046) (hereinafter "Contract" or "Prime Contract") was awarded to Harper/Nielson on August 27, 1996. (Exhibit "1"). .

### B. The Subcontract

Harper/Nielson subcontracted with KCI (hereafter the "Subcontract"), on or about April 2, 1997, for work on Phase III that included irrigation, soil preparation, lawns & grasses, planting and landscape maintenance for the fixed amount of $720,500.00. (Exhibit "2").

KCI had previously bid and completed work on Phase II, which was a similar project and contract at Vandenberg AFB. As such, KCI's bid for Phase III was based on its previous work on Phase II, as well as its experience and industry standards. In this regard, KCI's Phase III bid accounted for normal delays caused by weather and scheduling.

## C. The Project

### 1. Original Project Schedule

According to the original project schedule, landscaping fieldwork under KCI's Subcontract was to start on or around July 28, 1997. Work was scheduled to be completed by January 4, 1998. Thus, the original total contract duration was 161 calendar days.

KCI began its scheduled work on July 28, 1997. However, substantial completion was not established until August 15, 1998 for a total of 384 days. The reasons for the delay in completing KCI's scope of work are the subject of this claim and are detailed herein.

### 2. Preliminary Delays Caused By Delayed Performance Of Air Force Environmental Subcontractors

One day before KCI's Subcontract was awarded, the Project Manager for Harper/Nielson, Jeffrey A. Harper (hereafter "Harper"), sent a letter dated April 1, 1997, to the Contract Administrator for the Air Force, Lenny Horniak (hereafter "Horniak"), stating that the project had already been hindered by severe delays. (Exhibit "3"). This letter reflects the fact that through no fault of Harper/Nielson, or its subcontractors, progress on Phase III had been significantly delayed. In his letter , Harper cites several contributing factors as the cause for being behind schedule as of April 1, 1997.

First, and most significantly, delays by the Air Force contractor, Jacobs Engineering ("Jacobs"), and Jacobs subcontractor, V.P.S., Inc. ("VPS"), in the removal of underground storage tanks ("USTs") and contaminated soils on the site stalled the progress of Phase III even

before it had begun. On or about November 6, 1996 a request for modification of Harper/Nielson's Contract was made to delete a requirement for the removal of USTs containing hazardous liquids and surrounding contaminated soils. In a memo dated November 14, 1996 (Exhibit "4"), Horniak explained the reason for deleting the work from the Prime Contract and adding a separate environmental contract by stating that "due to the unforeseen conditions and volatile nature of remediating these UST sites," a separate contract under the Installation Restoration Program was more appropriate. He opined that the removal of the contaminated soil and the UST's were not suited to be a part of the housing project contract and would be better performed by an engineering firm who specialized in environmental clean up. In his memo, Horniak stated that removing this subcontracted work from the Prime Contract and instead funding it through the "Installation Restoration Program" would also reduce the risk of having to delete some of the housing units in order to fund the tank removal. The Prime Contract was ultimately modified to delete the removal of UST's tanks on or about March 10, 1997.

The Air Force entered into a contract with Jacobs separately in December 1996, who then awarded a subcontract for the removal of the UST's to VPS . In a memo to the Contract file dated April 11, 1997 (Exhibit "5"), Horniak reiterated that the removal of the underground storage tanks and contaminated soil was to have been completed by Jacob's within 30 days, or prior to January 16, 1997. Harper/Neilsen and KCI relied upon the 30 day completion schedule for the removal of the USTs. However, that work had been delayed nearly three months and, as set forth in a memorandum from Air Force Contracting Officer C. H. Painter (hereafter "Painter") to Government Officer Bob Griswold (hereafter "Griswold") dated June 10, 1998, Jacobs did not actually complete the removal of the tanks until April 15, 1997. (Exhibit "6"). As a result, Phase III was significantly delayed before KCI even began its scope of work.

### 3. The Impact of the Preliminary Delays on KCI

KCI began work on Phase III on July 28, 1997, as originally planned. However, KCI could not begin fieldwork until the first week of August. As a result of the overall project delays that preceded KCI's start, the work progress of Harper/Nielson and its subcontractors' was so severely hindered that KCI could not begin some of its work as scheduled or had to perform its work out of sequence.

The Phase III project specifications required specific sequencing of installation of the landscaping irrigation system (Exhibit "2"). In this regard, irrigation Section 02811 1.6 states that mainline must be installed after rough grade has been made and certified. Sleeving and conduit placement was to take place before the installation of concrete, asphalt or walls. Bubbler heads were to be installed after trees were installed but before backfill completed. Furthermore, Landscaping Section 02950 1.5 had sequence requirements as well. Specifically, planting was not to be performed before irrigation of fine grading, headers, vines, and trees.

Contrary to these specifications, due to the preliminary delays, KCI, along with other trades, were forced to work out of sequence and move from area to area to proceed with installation of the landscaping irrigation system. This re-sequencing upset the project work schedule and, through no fault or negligence of KCI, Harper/Nielson, or its subcontractors , created a situation which remained throughout the project of uneven, mismatched performance by subcontractors. In this respect, subcontractors would attempt to complete scheduled work only to be delayed, hindered and have their work damaged as a result of work being performed by others. KCI bore the significant expense of repairing these affected and damaged areas.

In a memo dated April 13, 1998, Kevin M. Smith (hereafter "Smith"), Harper/Nielson's Project Superintendent, described how the delays that preceded KCI's start date caused these

delays and damages. (Exhibit "7"). As reflected in this memo, Harper/Nielson was delayed more than five months as a result of the delays in the removal of the USTs. In Exhibit "7", Smith specifically addressed the impact of this delay on KCI's work stating:

> We knew how difficult and costly it was to landscape a project of this size, during rainy weather, upon completion of Phase 2 in November of 1996. With that knowledge, and some foresight to the oncoming "EL NINO" condition, we did everything in our power to move phases 3 and 4 along. We were unable to complete this task.

**4. The Impact of the Severe Weather Conditions On The Project Schedule**

In addition to the problems caused as a result of KCI and other trades being forced to work out of sequence, the winter of 1997-1998 brought another problem in the form of record-breaking rains. Beginning in early November 1997, the rains of the El Niño weather phenomenon began. These heavy rains caused severe damage to the hydroseeding that KCI had previously installed. Letters from KCI's Project Manager, Ted W. Maino (hereafter "Maino"), describe the significant rain damages incurred by KCI during the months of November 1997, through February 1998. (Exhibit "8").

On February 24, 1998, Smith notified Horniak that the inclement weather for the previous six weeks "made it impossible to complete the project" and formally requested a three-month extension for such delay. (Exhibit "9"). Smith also noted, "we have experienced quite a bit of damage" and provided Horniak with photographs of all storm-related damages in association with his request. (Exhibit "9"). Despite this documentation, Smith's request for a three-month extension was denied. Instead, Horniak only agreed to extend the contract a mere 49 calendar days.

Despite the demand for a three-month extension, on March 2, 1998, Horniak specifically acknowledged that "[t]he reason why the landscaping hasn't been completed is due to 'El Niño',

the name associated with this year's storms which dropped 36.43 inches of rain from Nov 97 to Feb 98. This is four times the normal amount." (Exhibit "10"). Horniak further acknowledged that the delay and damage caused by the severe storm conditions qualified as an Act of God under the default provisions set forth in F.A.R. 52.249-10 and was therefore an excusable delay. (Exhibit "10").

On April 13, 1998, Smith advised Horniak that Harper/Nielson and its subcontractors were experiencing continuing problems posed by the severe weather conditions. (Exhibit "11"). Smith further stated that the continuing rain, saturation of the ground, lack of sunlight and inadequate drying time caused considerable damage and delay and requested an additional two month extension. Specifically, Smith stated:

> We have made every possible attempt to work around and in the rain in the last three months, but have had no success. These attempts have only resulted in Hydroseed in the street, open trenches full of mud, machinery stuck in the mud, concrete that has to be removed and re-poured, and large sums of money being wasted to meet an impossible schedule.

(Extension "11")

**5. Unilateral and Uninterrupted Extension of the Maintenance Period**

KCI's work on Phase III under the Subcontract work description included a 90-day maintenance period after the acceptance date. The anticipated acceptance dates based upon the completion of the work were around or near late October of 1997 through January of 1998. (Exhibit "12") As reflected in a series of letters from Harper/Nielson to the Air Force dated from September 18, 1997 through December 18, 1998, Harper/Nielson turned over all units built in Phase III at 30 days after hydroseeding had been completed. (Exhibit "13"). As such, Harper/Nielson's one-year warranty began on each of the housing units during the dates beginning with October 23, 1997 through January 30, 1998.

However, the final inspections and eventual acceptance by the Air Force of the landscaping on the individual housing units did not begin until January of 1998and were not finalized until dates between March 23, 1998 through May 20, 1998. (Exhibit "14") The evidence reflects that prior to acceptance the Air Force issued a series of unreasonable demands that appear to have been designed to defer acceptance for as long as possible.

When the first final acceptance walk-through was conducted on January 28, 1998, a laundry list of reasons was given for denying acceptance in the Site Visit Report (Exhibit "15"). On January 29, 1998, the Contractor Quality Control Systems Manger for Harper/Nielson, Paul Olson (hereafter "Olson"), requested inspection and guidance to meet the requirements for the Air Force's acceptance. (Exhibit "16"). Many of the sites were not reported in the Site Visit Report and some of the items contained in the report were practices questioned by KCI. Those items that KCI took exception to are documented in letters attached as Exhibit "17". As reflected in the letters from KCI, some of the planting requirements that the Air Force insisted upon, and denied acceptance due to, were not common or best practice by landscape specialists and if performed would in fact result in damage to the plants. (Exhibit "17").

On February 9, 1998, Olson noted in his quality control report that after 12 days from the January 29, 1998 walk-through, the contractor still had not been provided the list of required corrective action for a number of the units. (Exhibit "18"). In addition, he reported that due to extreme weather conditions, additional damage had taken place. (Exhibit "18"). On February 12, 1998, Olson again requested attention and response to those items KCI had taken exception to, as well as requesting inspection on plants and materials prior to planting so that compliance could be met by KCI. (Exhibit ""). Finally, on March 2, 1998, over one month from Olson' request for clarification, Harper/Nielson received a response dated February 25, 1998 to Olson's

inquiries. In his response, Painter simply insisted that the requirements stated in the January 29, 1998 Site Visit Report must be met despite the numerous reasons provided by Olson to not perform such requirements. (Exhibit "20") Painter's response was received Harper/Nielson continued to request acceptance inspections. However, personnel assigned to conduct the inspections by the Air Force contracted Landscape Architect, Fisher Friedman Associates (hereafter, "Fisher Friedman"), either conducted the inspection weeks after the request was made or did not show up at all. (Exhibit "21"). Charlie Milkewicz (hereafter "Milkewicz"), the Title II inspector employed by Fisher Friedman, frequently did not perform the inspections or document any reliable data to support any inspections. (Exhibit "21"). The conduct of the assigned inspector, Milkewicz, was apparently so unsatisfactory that a credit was offered to the Air Force in the amount $7,000.00 to "cover services not rendered but required under contract." (Exhibit "21"). Highlighting these problems is the fact that, ultimately, the Air Force requested reimbursement in the amount of $28,261.81 to make up for the inspections required, but never completed on the project. (Exhibit "21").

**6. Change in Wage Classification Specification**

KCI's Subcontract described the following work to be completed in Phase III:

- 02911 Irrigation
- 02920 Soil Preparation
- 02930 Lawns & Grasses
- 02950 Planting
- 02970 Landscape Maintenance

While some of the above work requires the skill and knowledge of a "Landscape and Irrigation Laborer" or a "Landscape Laborer" classified worker, as those classifications are described in the General Prevailing Wage Determination ("the GPWD"), the "Landscape Maintenance" portion (02970) does not.

Inherent in KCI's bid for Phase III was the assumption that the wage classifications established in the equivalent project Phase II would remain the same throughout Phase III. In this regard, KCI was consistent in the use of the classification of "Tradesman" found in the Pipe Fitters Union with a base rate of $8.62, to perform maintenance. The work to be performed under Section 02970 of the contract, Landscape Maintenance, describes the following qualifications for the labor force under that section: "The landscape maintenance labor force shall be thoroughly familiar with, and trained in, the work to be accomplished and shall perform the task in a competent efficient manner acceptable to the Government." The related work described under this section is limited to:

- Existing Planting to Remain – Section 02116
- Irrigation System – Section 02811
- Soil Preparation – Section 02920
- Lawns – Section 02930
- Planting – Section 02950

On October 7, 1997, Harper/Nielson delineated the definition and classification of a "Tradesman" in a letter to Horniak and requested that an additional classification for "Tradesman" be recognized for work to be performed in Phase III. (Exhibit "22"). On October 30, 1997, the Air Force responded by stating that KCI was required to use the classification known as "Landscape Laborer," which required a base rate of pay of $13.40 plus $8.61 in fringe benefits, to complete the tasks required under Section 02970. (Exhibit "23") KCI was further directed to issue checks for the difference in pay rate immediately to those laborers affected. (Exhibit "23") KCI complied with the directive and issued checks for the discrepancies and continued to pay its labor force at the higher "Landscape Laborer" wage rates throughout the completion of the Phase III.

In December of 1997, after learning that the GPWD recognized a classification of "Landscape Maintenance Laborer," which more closely fit the work description and qualifications necessary under Section 02970. Curt Boutwell of KCI directed his staff to submit a request for an additional wage classification. (Exhibit "24"). Under this classification, a "Landscape Maintenance Laborer," received a base rate of pay in Santa Barbara County of $7.00. This request was submitted by KCI. However, the Air Force never responded to this request.

## III. Entitlement to Equitable Adjustment

KCI should not be charged for the excessive delay in the completion of the project, nor the damages it incurred as a result of the delay, including additional labor costs, equipment and materials. Under the Federal Acquisition Regulations, the Contractor has a right to proceed and the Contractor shall not be charged with damages if the delay in completing the work arose from unforeseeable causes beyond its control. (Exhibit "1"). In this instance, F.A.R. 52.249-10 (b) provides: "The Contractor's right to proceed shall not be terminated *nor the Contractor charged with damages* under this clause, if:

> (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include:
>
> (i) Acts of God...
>
> (ii) Acts of the Government in either its sovereign or contractual capacity,
>
> (iii) Acts of another Contractor in the performance of a contract with the Government, ...
>
> (x) Unusually severe weather, or
>
> (xi) Delays of subcontractors or suppliers at any tier arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and the subcontractors or suppliers." (Emphasis added)

These types of unforeseeable causes beyond the control of the contractor actually occurred during KCI's completion of the Phase III project. The resultant delays were beyond the

control and without the fault or negligence of the Contractor, its subcontractors, including specifically KCI.

As such, because neither KCI, nor Harper/Nielson were at fault or negligent in their work to complete the project, they cannot be charged with the resulting damages.

**A. Project Delays Due To Removal Of Underground Storage Tank**

The delays caused by Jacobs constitute a qualifying excusable delay under subsection (1)(iii) and (ix) of F.A.R. 52.249-10 (b). When a contractor has been delayed by a subcontractor, the delay is excusable if the delay arose from "unforeseeable causes" that were "beyond the control and without the fault or negligence of both the Contractor and the subcontractors and suppliers." *Appeal of E & R, Inc.*, 95-2 BCA (CCH) P27, 745.

In this case, neither Harper/Nielson nor KCI had any control over the work performed by Jacobs in the removal of the USTs, because Jacobs contracted directly with the Government to perform the work. As reflected in Exhibit "5", the Air Force entered into a contract with Jacobs separately in December 1996, who then awarded a subcontract for the removal of the tanks with V.P.S. In Exhibit "5", Horniak reiterated that the removal of the underground storage tanks and contaminated soil was to have been completed by Jacobs within 30 days, or prior to January 16, 1997. Again, Harper/Nielsen and KCI relied upon the 30 day completion schedule for the removal of the USTs. However, as Painter noted in his memorandum to Griswold dated June 10, 1998 (Exhibit "6"), Jacobs did not actually complete the removal of the tanks until April 15, 1997.

There is conclusive evidence that while under the Government's direct control, Jacobs encountered unforeseen circumstances with regard to the USTs that significantly delayed the completion of the work. (Exhibits "3", "4", "5" and "6"). As noted in Exhibit "7",

Harper/Nielson even offered to assist Jacobs at its own cost to expedite the return of necessary testing in order to speed up the UST removal process. Jacobs' inexplicable rejection of this offer only further evidences Harper/Nielson's lack of control over Jacobs and the delays caused by Jacobs.

Additionally, the Air Force itself recognized that the delay caused by Jacobs was not within the Contractor's control. In a memorandum dated May 5, 1997, to the contract file, , Horniak specifically states; "This documents the contract file that the Gov't has determined that those months [Harper/Nielson] was behind schedule was beyond their control." (Exhibit "25").

All of the delays described above, beginning with the removal of contaminated soils and USTs, forced work to be conducted out of sequence, thereby causing KCI to incur damages due to of the amount of work that had to be repaired or redone. On or about October 6, 1997, in a letter to Harper/Nielson, KCI gave notice of the adverse effects that hydroseeding before the fencing could have been completed . (Exhibit "26"). Despite this cautionary letter, KCI was directed to hydroseed prior to the completion of work of other subcontractors, and other subcontractors were directed to complete work after hydroseeding. Harper/Nielson had been put behind in their schedule, through no fault of their own, by the Air Force in its contractual capacity. This caused damage to the hydroseeding, which eventually had to be reinstalled.

Evidenced by the photographs attached hereto (Exhibit "27"), KCI met its schedule for planting, only to have it destroyed by subsequent work that followed. Modifications were requested by KCI but were left unanswered for an unreasonable amount of time. (Exhibits 28-29). Once modifications were finally made to the Contract, the sewer repairs, installation of storm drainage and water damage all contributed to the further upset in scheduling. The delays in providing authorization for the necessary modifications to the Contract by the Air Force

caused a conundrum whereby a problem would arise and a modification to correct the problem would be requested but unanswered, while Harper/Nielson and KCI attempted to work around the situation. Once the modification was finally authorized, a new problem was presented to be corrected.

These delays in completing the work arose from unforeseeable causes beyond the control and without the fault or negligence of the Contractor. Indeed, they are due to the acts of the Government in its contractual capacity. Further delays of other subcontractors arising from unforeseeable causes beyond their control and without the fault or negligence of both the Contractor and the subcontractors caused KCI to suffer damages.

**B. Acts of God or Unusually Severe Weather**

In addition to the damages attributable to the initial project start delays, KCI suffered further damages as a result of the severe weather conditions encountered during this project. The Air Force itself acknowledged during the project that the severe weather conditions met the requirements for excusable delay due to unusually severe weather or "Acts of God."

Delay is excusable due to unusually severe weather under F.A.R. 52.249-10 (b)(1)(x) if the following elements are satisfied: (i) identification of the work controlling the overall completion of the contract; (ii) the controlling work was delayed by weather; and (iii) the weather was unforeseeable (i.e. unusually severe). *Appeal of Essential Construction Co., Inc., & Himount Constructors, Ltd, a Joint Venture*, 78-2 BCA (CCH) P13, 314.

**1. KCI's Work Controlled Completion of the Project**

On this project, completion of the landscape installation, hydroseeding of turf and the landscaping maintenance controlled the overall completion of the project. As the Government's

initial call for bids, attached as Exhibit "30", clearly reflects, the project was to completed in the following order:

> (1) Razing the existing development, single family houses containing asbestos materials, suspected underground storage tanks, concrete foundations pads, sidewalks, landscaping and some street work; (2) site preparation, underground utilities. Reconfiguration of existing street system and sidewalks; (3) construction of 143 new housing units (performed in 25 unit increments), fences, recreational facilities, installation of street signs, lighting, etc.; (4) landscaping of yards and common areas, including installation of sprinkler systems in common areas.

Completion of the landscape maintenance was to be the last item for project site work completion. Thus, KCI's work ultimately controlled when the project would be completed.

**2. The Controlling Work was Delayed by the Weather**

KCI's damages and delays caused by severe weather are primarily attributable to the damage caused by the heavy rains requiring significant repair or restoration work. KCI's hydroseeding work was the hardest hit as evidenced by a series of letters dated December 19, 1997, through July 1, 1998, from KCI Project Manager to Harper/Nielson, attached as Exhibits "31". As set forth in Exhibit "31", the heavy rains and winds during the winter months caused damage to hydroseeding, requiring KCI to replace the hydroseeding in many areas.

The hydroseeding, however, was not the only part of KCI's work adversely affected by the severe weather conditions. As reflected in the Daily Extra Work Bills, there were many instances of weather damaged trees and washed out areas. Exhibit "32". In addition, the heavy and continuous rainfall damaged other plantings and caused soil erosion problems requiring repair and clean-up. In this regard, the total rainfall recorded by Harper/Nielson from November 30, 1997 through February 23, 1998, totaled 22.84 inches and caused damage to 149 items, including erosion, silt build up, damaged plants and trees all due to the heavy rains and winds, most of which required repair or restoration of damaged landscaping. (Exhibit "9").

**3. The Weather Was Unusually Severe and Unforeseeable**

The weather conditions that caused this significant damage clearly constitute the type of unusually severe weather contemplated by F.A.R. 52.249-10 (b)(1)(x). Due to the excessive rains caused by the El Niño storms during the winter of 1997-1998, thirty-one California counties were declared to be in a state of emergency, including Santa Barbara County,.. The heavy rains began in November of 1997 and did not diminish until approximately May of 1998. Exhibits "7" through "11" document the events that led to a request for equitable relief based upon the damage associated with the unusually severe weather conditions.

The Air Force acknowledged that the conditions for excusable delay under F.A.R. 52.249-10 (b)(1)(x) had been met and indeed agreed to some modest contract extensions on this basis. However, the Air Force improperly required Harper/Nielson and its subcontractors, including KCI, to bear the expenses associated with the damage caused by the weather conditions. In his March 2, 1998 memorandum to the contract file (Exhibit "10"), Horniak admits that a time extension is needed stating: "4. The contractor is entitled to a time extension and the contractor bears the financial risk of an excusable delay."

This notice concedes KCI's entitlement to a time extension. However, the notation that the contractor is to bear the financial risk is simply incorrect. Attached to the memorandum found within the contract file is a copy of a contract provision, F.A.R. 52.249-10, dated March 2, 1998. It reads in pertinent part:

> "(b) The Contractor's right to proceed shall not be terminated *nor the Contractor charged with damages under this clause, if* – (1) The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor...." (Emphasis added.).

Clearly, under F.A.R. 52.249-10 should not bear the financial risk of an excusable delay. In fact, KCI is entitled to receive compensation for such delay. In this regard, F.A.R. 52.242.17

provides that "adjustment shall be made for an increase in the cost of performance of this contract". In accordance with this provision, a request was made on March 13, 1998, by Harper/Nielson for equitable relief for the storm damages. On March 23, 1998, the Air Force denied the request. (Exhibit "33"). Two reasons for the denial were given: (1) The project had not yet been accepted under the contract; and (2) Harper/Nielson had allegedly incorrectly cited an improper authority to make a claim under the Contract. Given the fact that it is now well past the project acceptance date, KCI is now entitled to recover its damages as a matter of law for unusually severe weather under provisions of the Contract in accordance with F.A.R. 52.249-10.

Furthermore, the extensions which were approved by the Air Force were wholly inadequate. As previously stated, KCI initially requested a three-month extension to the contract seeking compensation for the extended period of time and for the damages incurred. The Air Force responded to the request in a Memorandum dated March 2, 1998, agreeing to an extension of the Contract, but just for a mere 49 days, thereby changing the contract completion date from March 2, 1998 to April 20, 1998. (Exhibit "10").

In so doing, the Air Force provided the following rationale on the method used to calculate 49 days instead of the requested three-month extension: "Normally, we have 30 rain days from the months Nov. – Feb. This year, we had 56 rain days, almost double the normal rain days for these months. The 26 additional rain days plus 13 days drying time is how we established a 49 cal day time extension. (Exhibit "10"). This reasoning is clearly flawed in that the calculation supplies an extension for missed days due to rain, but does not supply an extension of time to fix all of the damages caused by the excessive rain. The damages caused by the rain were so severe that most of the work already accomplished in February was in need of repair or complete restoration. It is difficult to understand the reasoning advanced by the Air

Force for only allowing 13 days drying time for a drench soaked project site still being battered by the most severe winter weather in nearly 20 years. In fact, the wind and rain of the winter of 1997-1998 was so unusually severe that the County of Santa Barbara had been declared in a state of emergency.

On April 13, 1998, Harper/Nielson again requested a significant time extension to the contract. (Exhibit "11"). The basis for this two-month request was that the severe rains had already damaged, and continued to damage, work already accomplished on the project. The two-month request was not unreasonable. Given the fact that without some allowance of time passing without rain, reasonable continuation of the project work was impossible. On the same date, April 13, 1998, Harper/Nielson described how the delay caused by Jacobs in the removal of the USTs had a domino effect by pushing the project into the rainy season. (Exhibit "G7). The additional time and recovery sought on April 13, 1998 for the damages caused by the delays and unusually severe weather could have mitigated the damages Harper/Nielson now seeks on behalf of KCI.

On June 10, 1998, Painter sent a memorandum to Griswold attaching Harper/Nielson's letter of April 13, 1998. (Exhibit "6"). In that memo, Painter issued a request to Griswold to provide information relevant to Harper/Nielson's request for compensation for damages to the landscaping work done on Phase III caused by the delays of Jacobs Engineering. In response, Griswold made the following recommendation:

> Harper/Nielsen may be entitled to compensation for delays but the extent of these delays is nearly impossible to determine. Many of the delays and problems experienced by [Jacob] would have impacted the construction schedule of [Harper/Nielsen] even if work had been performed as originally called for in contract. Extreme weather conditions encountered by [Harper/Nielsen] would have occurred in any case at some stage of construction and some damages would have occurred. A determination would have

to be made by your office regarding compensation allowed for delays and damages due to extreme weather conditions.

(Exhibit "34")

However, despite this recommendation, a final determination was not provided. Furthermore, all previous requests for equitable relief have been inexplicably denied.

**C. KCI Was Required To Maintain Landscaping Beyond A Reasonable Period Of Time.**

As described in detail above, KCI was originally contracted to provide 90 days maintenance beginning on or about October of 1997 through January of 1998. (See Exhibit "12"). Even though Harper/Nielson turned over all units built in Phase III at 30 days after hydroseeding had been completed, the final inspections and eventual acceptance by the Air Force of the landscaping on the individual housing units did not begin until January of 1998 and was not finalized until dates between March 23, 1998 through May 20, 1998. (Exhibit "14") In this regard, the Air Force was deliberately dilatory in its manner of acceptance of the landscaping on the project. The dilemma of the Air Force at the end of the project was that, although Phase III had been completed and the homes were ready for occupancy, new personnel had not yet arrived to occupy the houses. (Exhibit "35"). This dilemma required KCI to continue to maintain landscaping at the empty homes, where under normal circumstances new occupants would have been able to provide those services, such as mowing, trimming, and watering. The evidence of the unreasonable demands of the Air Force upon KCI prior to acceptance of the work illustrates that the delays in acceptance of Phase III were caused by the Air Force and were not the fault of Harper/Nielson or KCI. These delays and unreasonable demands asserted by the Air Force for acceptance of the project constituted additional terms to the contract for which KCI was not compensated.

The Air Force inspectors evaluated completion based on unreasonable standards and defective landscaping specifications for accepting plants and trees. These standards did not incorporate any reasonable interpretation for tolerance, with reference to average health, of the same species. Specifically, the warranties called for throughout the applicable specifications consistently require plants and / or trees to be "healthy and in flourishing condition of active growth." Yet, the Government imposed unilateral, defective and unreasonable specifications in that it required (1) that living organisms grow during the winter season and harsh conditions at a vigorous rate that is equivalent to that of a vigorous rate during a different season and more optimum conditions; (2) that plants on the east, south, west, and north sides of a building grow at the same rate; and (3) that plants planted in different months be identical in size. As a result of these defective specifications, the Government unilaterally rejected a high percentage of the trees and plants. This rejection process remained consistent through out the maintenance period even though the significant amount of plants and trees that KCI installed met or exceeded the objective requirements set for in the contract of "active growth," and vigor with the consideration that they were planted during such adverse weather conditions.

Additionally, as with any living item, identical plants are have some variance in initial growth levels. Plants are expected to have some reasonable variance, and if this variance is not included in the inspector's definition, acceptable trees will end up being rejected due to incorrect and unreasonable inspection. Nonetheless, the Government's acceptance standards did not allow for any variance resulting in rejection of a significant amount of trees and plants on this basis as well.

Finally, KCI was required to replace and restart maintenance on plants and trees that were damaged as a result of the severe weather conditions that prevailed through the spring.

This requirement is in direct contradiction with the applicable project specifications which state "Contractor shall not be held responsible for failure due to neglect by the Government, vandalism, and acts of God, during the Warranty Period." (Exhibit "1") As a result, KCI was able to complete its duties under the contract on the individual homes until August 1998, and in the common areas until November of 1998.

**D The Wage Classification Change Asserted by the Air Force, Increased Wage Rates, and Constituted Change in the Terms of the Contract After Acceptance.**

The Government's unilateral decision, long after KCI's contract was awarded and work had commenced, to require KCI to re-classify KCI's "Tradesman" workers as "Landscape Laborer" imposed a defective specification by the Government and caused significant additional expense for KCI. KCI's Subcontract's work description included work that should be performed by a worker classified as a "Tradesman". Further, KCI had in fact used the "Tradesman" classification for the very same work in Phase II.

To receive an adjustment based upon defective specification, a contractor must show that the specification was defective and that the defect caused the contractor to incur additional costs. *Appeal of McElroy Machine & Manufacturing Company, Inc.* 99-1 BCA (CCH) P30, 185. In this case, the specification at issue was the wage classification for certain KCI's workers. Only a portion of the work described in the Subcontract required the skill and knowledge of a "Landscape and Irrigation Laborer" or a "Landscape Laborer" classified worker, as those classification are described in the General Prevailing Wage Determination ("GPWD"). "Landscape Maintenance" work as defined in the contract did not impose such a requirement.

Despite the distinction between these areas of work, the Government nonetheless ordered KCI to re-classify its labor, even for maintenance work, to be paid as a "Landscape Laborer." This re-classification meant that for those workers who had been paid the lower "Tradesman"