base rate of pay of $8.62 to complete the tasks required under Section 02970, "Maintenance", KCI was now required to pay the rate of $13.40 plus $8.61 in fringe benefits, plus back wages for the differential. In this respect, KCI was directed to issue checks for the difference in pay rate immediately to those laborers affected. In response, KCI issued checks for the discrepancies and continued to pay its labor force at the higher wage rates throughout the completion of Phase III.

KCI based its bid wage rate for Phase III on the presumption the same classification as used on Phase II would be used on Phase III because no question or issue was raised during the entirety of Phase II regarding the classification or rate. When the Air Force raised the issue, KCI submitted a Request for Authorization of Additional Classification and Rate. When a wage determination does not contain a classification for a particular laborer, as the Government's directive letter did not, it is necessary for the contractor to develop wage rates for the omitted categories, or to "gap-fill." F.A.R. § 22.406-3(b) sets the criteria for acceptance of the requested classification and wage rate as: (1) Classification is appropriate and the work to be performed by the classification is not performed by any other classification contained in the applicable wage determination, (2) The classification is utilized in the area by the construction industry, and (3) Classification is appropriate and the work to be performed by the classification is not performed by any other classification contained in the applicable wage determination.

**1. Classification Appropriate for Work Performed and is Not Performed By Any Other Classification:**

The first element for approval of a proposed wage rate requires a showing of (i) appropriateness of the classification in regards to the work performed, and (ii) the classification is not contained within another applicable wage determination.

**a. Appropriateness of the Classification in Regards to Work Performed**

It has been established that the proper standard to judge the appropriateness of authorization for an additional classification is the demonstration that there is an existing classification in the industry which actually performs the work in question. *Volkman Railroad Builders*, WAB No. 94-10. (Aug. 22, 1994). It was the opinion of the Air Force that the work was to be performed by the classification of "Landscape & Irrigation work" as well as "Landscape Laborer." However, both of these classifications include installation, which is work beyond that of mere maintenance of landscape (cutting grass, and watering plants during warranty) that has previously been installed. Put simply, the skill level of cutting grass and watering plants does not require a $22 an hour labor as the Air Force dictated.

KCI's request was for a "Landscape Maintenance Worker" classification, which applied strictly to that of maintenance work described in Section 02970 of the Specifications. This type of work classification was omitted from the Government's directive letter of October 30, 1997. (Exhibit "36"). Yet, it is <u>maintenance</u> work which is performed on installed landscapes, which is separate and distinct from the <u>installation</u> of landscape and/or irrigation. In this respect, work to be performed under the Landscape Maintenance Worker classification is:

> "301.12. Plant establishment as such work described in the employers contract documents shall be work covered by this Agreement. **This work may be performed exclusively by Landscape/Irrigation Tradesman** without the supervision of a Journeyman."

(Exhibits "37" & "38").

This definition was taken from the Agreement between the California Landscape and Irrigation Council and the Southern California Pipe Trades District Council No. 16. An agreement to which KCI is a signatory on all projects. This above definition as well as its wage and fringe benefit schedule were also included in the Fringe Benefit Statement submitted.

(Exhibit "39"). Moreover, KCI also included the GPWD of California in its request that listed "Landscape Irrigation Tradesman" as a classification for Santa Barbara County as well as a wage schedule for "Landscape Maintenance Laborer". (Exhibit "40").

The definition contained in the union agreement, as well as the distinct categories put out by the California GPWD all establish that the classification is appropriate for the work performed.

**b. Work Not Performed by Other Classification**

The work to be performed by the Landscape Maintenance Laborer is solely related to the work described in Specification Section 02970, which states: "Work Included: Provide continuous Landscape Maintenance, complete as specified during progress of work, **after installation...**" (Exhibit "2"). (Emphasis added).

If this work was performed by the same wage classification as the remainder of the work, then there would be no need to separate it from the other work in the specifications. By separating the maintenance portion of the contract, the Air Force clearly distinguished this work from that of "installation of landscape and/or irrigation". In this same regard, since this specific work is separate and distinct in the labor agreement as well as the California GPWD, it was certainly reasonable for KCI to presume it would be able to use Landscape Maintenance Laborers to perform the work.

Furthermore, the separate classification of Landscape Maintenance exists in the Federal GPWD. The classification contained within Exhibit "40", is from the General Decision Number CA980001 the classification for Final Clean-up and Landscape Maintenance Work, and is taken from the Federal Wage Determination. This shows that the work at issue is indeed separate and

distinct from that of installation of landscape and/or irrigation. (Exhibit 41). Landscape Maintenance is described in the CA980001 decision as:

> "**Work in existing or newly landscaped** projects, such as watering, weeding or mowing and edging, pruning, fertilizing. Replacing or repairing of existing installations (including the repair and replacing of electrical and water systems, sweeping, repainting and restriping)."

(Exhibit "41").

This definition of work performed by a Landscape Maintenance Laborer is not referenced by the Government's denial letter of October 30, 1997, which describes installation of landscaping and irrigation work, but omits the definition of maintenance. (Exhibit "36"). The fact that the type of work is not included under the classifications, as claimed by the Air Force originally, is established by the fact that a Government Agency has now included it as a separate and distinct classification General Decision Number CA980001. (Exhibit "41"). KCI's use of the classification was not new. Indeed, as discussed below, it is an established classification for the construction industry, as well as the geographical area.

**c. Classification Utilized in the Area by the Construction Industry**

The second criteria that must be established is that the classification requested is utilized in the area by the construction industry. In *Volkman Railroad Builders, supra*, the Board, under the guidance of F.A.R. criteria, looked to past agreements of various local unions to determine if the classification was indeed utilized in the area. On this project, the work in question was expected to be, and was performed by members of the Southern California Pipe Trades, which was a part of the California Landscape and Irrigation Council. (Exhibit "42").

The use of a separate classification for the maintenance type of work is seen both in the California GPWD, as well as that of Southern California Pipe Trades District Council No. 16, the specific labor union KCI to which is obligated. (Exhibit "43"). The California GPWD refers to

the classification as a "Landscape Maintenance Laborer," and the local union refers to it as a "Landscape Irrigation Tradesman," both of which can be found in KCI's original request. (Exhibit "40"). In addition, the Government has now included the classification in its Federal Wage Determination, a sign of its own acknowledgment of the separate and distinct classification of the work performed. (Exhibit "41").

**d. Proposed Wage Rate has Reasonable Relationship to Contract Wage Rate Determination**

The third and final element that must be shown is that the proposed wage rate, including the fringe benefits, must exhibit a reasonable relationship to that of the wage rates in the wage determination. It should also be noted that it has been held that a proposed landscape laborers classification with a wage rate less than that of the construction laborers is reasonable and valid. *Hillside Gardens, Inc.* WAB No. 90-32 (June 26, 1991).

KCI submitted the wage rates for both the Landscape Maintenance Laborer, Landscape Irrigation Tradesman, as well as the 1998 California modification to the GPWD. The comparison of those, along with KCI's actual wage rate is as follows:

| CLASSIFICATION | BASE WAGE | FRINGE | TOTAL |
|---|---|---|---|
| 1995-96 Landscape Maintenance Laborer (SB) [Exhibit "43"] | $7.00 | $0.26 | $7.26 |
| 1997-98 Landscape Irrigation Tradesman (SB-CA GPWD) [Exhibit "43"] | $8.62 | $2.85 | $11.47 |
| 1997-98 Landscape Irrigation Tradesman (SB-C.L.I.C.) [Exhibit "43"] | $8.62 | $3.05 | $11.67 |
| 1998 CA Decision 980001 Maintenance Work (San Diego) [Exhibit "41"] | $8.91 | $5.18 | $14.09 |

KCI's bid rate and actual wages were based upon the 1997-98 rate for the Landscape Irrigation Tradesman, a rate that is higher than the California GPWD, as clearly required by union agreement. . Clearly, KCI's rate and classification was reasonable and in accordance with actual costs of the laborer within the region.

In summary, "Landscape Irrigation Tradesman" is the correct wage rate for employees who are performing work solely in regards to the maintenance of previously installed landscape. It the intent of the contract documents for KCI to pay construction installation wages for a craft that is solely performing lawn and tree grooming/maintenance during the warranty period. As such, the Government is now responsible for the costs associated with its directive of this change order.

## IV. Damages

### A. Reasonableness Of Request

#### 1. Types Of Damages Requested

**Issue:** What are Types and Methods for calculating Damages to determine the reasonableness of KCI's entitlement and the actual impact of the disruptions and delays on this project.?

As a result of the disruption and delays experienced on this project, KCI has suffered additional costs associated with:

- **Unabsorbed Home Office Overhead** - Damages associated with costs incurred for the benefit of all work in progress maintaining company operations.
- **Extended General Conditions** - Damages associated with renting and supplying field equipment for the additional duration, as well as providing additional field supervision used for schedule mitigation efforts, change work, and additional field days, and other incidental delay costs
- **Labor Inefficiency** - Damages associated with the unanticipated significant increase in labor required to do the extended work, and inefficiencies that resulted.

- **Proposal Preparations** - Damages associated with the use of a consultant to prepare and complete this Request for Equitable Adjustment.

The costs are calculated based upon 329 calendar days of delay (Exhibit "44"). The 329 calendar days is the difference between the As-Bid and estimated As-Built schedules. In regards to the reasonableness of such damages, it is well settled that "...once a party adequately demonstrates the existence of damages, it need not quantify their exactness to a mathematical certainty. *Wilner v. United States,* 23 Cl.Ct.241 (1991); *Lindmann Maschinenfabrik v. American Hoist,* 895 F.2d 1403, 1406 (Fed. Cir. 1990); *Capital Elec. Co. v. United States,* 739 F.2d 743, 746 (Fed. Cir. 1994).

What is considered reasonably compensable is "a matter for determination according to the circumstances of each case. *Houston Ready-Cut House Co. et al. v. United States,* 96 F.Supp.629. "Reasonable" also depends on the assumption that the Contractor's original bid was realistic, its actual costs were reasonable, and it was not the fault of the contractor for the added expense, which has already been established. The damages set forth herein are calculated by means and methods widely accepted by the industry.

## V. Actual Damages

### A. Home Office Overhead Impact

#### 1. Defined:

Indirect costs are those that are incurred despite activity or inactivity on a project, and include home office overhead costs. *Interstate Ge. Gov't. Contractors,* 12 F.3d at 1058. These include costs for running the home office such as office space, copiers, office supplies, and the salaries and fringes of company management, estimators, and other administrative staff. Contractors recover these costs by proportioning them among all of its contracts. *Mech-Con Corp. v. West,* 61 F.3d 883, 886, (Fed. Cir. 1995).

As contract work is performed and billed under normal conditions, projects absorb a fair portion of the home office overhead. However, when the project billings are delayed, other projects absorb an unfair portion of the home office overhead.

Unabsorbed Home Office Overhead costs are those that have exceeded anticipated markup costs incorporated into the original Contract. The courts have recognized these costs as a recoverable delay impact. *Luria Bros. & Co. v. United States,* 369 F.2d 701 (1996); *William Enterprises, Inc. v. Straight Manuf. & Welding, Inc.,* 728 F.Supp. 12(.D.D.C. 1990). Delay on a project results in the Contractor incurring additional indirect costs, or Home Office Overhead. As the courts have stated:

> "When the Government delays or disrupts contract performance, ultimately requiring that it be extended, the contractor's stream of income from the government for the direct costs it has incurred under the contract is reduced or interrupted. [Citations omitted]. However, **home office overhead continues to accrue throughout both the original and extended performance periods, regardless of direct contract activity."**

*Altmayer v. Johnson,* 79 F.3d 1129, 1132 (Fed. Cir. 1996); *All State Boiler, Inc.,* 146 F.3d 1368. (Emphasis added).

Home Office Overhead increases in direct proportion to the increase in time beyond the original performance period. Since projects are bid with a fixed percentage markup consisting of an overhead component, when work is suspended, and as a result delayed, this markup is not recovered. The result is that the project is not absorbing its overhead component, which was supposed to cover its portion of the Home Office Overhead for the period billed.

Since these home office costs continue to accrue absent progress billings, other projects absorb these costs out of the profit portion of their markup. The portion of the overhead that the suspended project did not bill for during the planned performance period is called unabsorbed

Home Office Overhead. If the contractor does not recover these costs, it loses money on all projects in progress, not just the project that was suspended for the uncertain amount of time.

The impacts suffered by extending the duration of overhead are directly related to the length of the suspension and overall delay on the project. This delay will limit the start of new work due to restricting company resources, both manpower and equipment, as these will remain in use on the current project.

In essence, unabsorbed home office overhead is a concept in which, in the event of a delay and/or suspension, a contractor is unable to absorb its home office costs as planned because the field activity has been reduced. It is a general and known part of delay damage calculations, including those incurred on government projects. *Combs v. United States,* 103 Ct. Cl. 174 (1945). For these reasons, KCI is entitled to recovery of unabsorbed overhead costs which are being incurred as a result of the significant delay and resulting extension of schedule.

**2. Unabsorbed Overhead Recovery**

The Courts have held that the Eichleay is the only method used to calculate home office overhead.

> "The Federal circuit endorsed this formula -- the 'Eichleay formula' -- as the appropriate method to calculate... costs after a suspension of performance by the government."

*West v. Allstate Boilers, Inc.*, 146 F.3d 1368 (1998); *Wickman Contracting Co. v. Fischer,* 12 F.3d 1574 (1994); *C.B.C. Enters., Inc. v. United States,* 978 F.2d 669 (1992).

The Eichleay formula calculates the amount of home office overhead that was allocated to the project, by dividing the total contract value by the total sales for the same period. (Exhibit "45"). It then takes that number and multiplies it by the total home office overhead for that period. The portion attributable to time impacts is calculated by dividing allocable overhead to the project by the revised contract duration, then multiplying by the number of delay days. Due

to that delay, the daily overhead rate for the revised project duration is substantially higher than the fixed mark-up that was reasonably anticipated at bid time. Again, in a fixed price construction contracts, the costs of the contractor's home office organization are allowable to the extent that they are reasonable and allocable in relation to the contract. F.A.R. Part 31; specifically F.A.R. 31.201.1,2,4. This formula is shown in the following table:

| ALLOWABLE OVERHEAD | | | | |
|---|---|---|---|---|
| Original Contract & Changes / Total Billings for Revised Contract Performance Time | X | Total O/H Revised Contract Duration | = | O/H Allocable to Contract |
| OVERHEAD RECOVERY | | | | |
| O/H Allocable to Contract / Revised Performance Period | X | Delay Days | = | O/H Recovery |

Through this calculation, and as shown in Exhibits 44 and 45, KCI is entitled to $125,706.71 for the 223 calendar day delay period beyond the original completion date, less any overhead costs that may have been covered in other change Orders. All unallowable G&A costs have been removed for the purpose of Eichleay. (Exhibit "46").

| HOME OFFICE OVERHEAD | |
|---|---|
| Eichleay | $125,706.71 |

In summary, KCI requests $125,707.00 for Unabsorbed Overhead damages incurred.

**B. General Conditions**

As a result of the delay and disruptions experienced on this project, KCI has had to continue its general jobsite overhead. These costs, like home office overhead, are also time-

sensitive, therefore the greater the extended period the greater the detrimental impact. However, unlike home office overhead, they are direct costs and therefore allocable to the specific project. These include (1) Site Administration, and (2) Extended Equipment Costs.

**1. Site Administration**

Extended site supervision is another recognized damage caused by the impacts of shifting a significant amount of work to a period after the original project completion was to take place. As a result of the delays, KCI had to provide additional supervision past its original completion date.

F.A.R. 31.105 (d) states: (3) Costs incurred at the jobsite incident to performing the work such as cost of superintendence, timekeeping and clerical work, engineering, utility costs... are recoverable. KCI's extended supervision claim is broken down as follws:

| EXTENDED SUPERVISION | |
|---|---|
| Extended Hours | $743.50 |
| Wage rate (base & fringe) | $25.00 |
| **Subtotal** | **$18,587.50** |
| 16.2% Burden | $3,011.18 |
| **Subtotal** | **$21,598.00** |
| 23% Overhead | $4,967.70 |
| **Subtotal** | **$26,566.37** |
| 5% Markup | $1,328.32 |
| **Total** | **$27,894.69** |

KCI had to allocate additional supervisory resources in the field until August 15, 1998, which was 329 days past the original substantial completion date. Attached is a chart which provides a summary of the extended administration hours allocated to this project. (Exhibit "47"). From the original point where KCI should have pulled off, or ceased supervision, KCI has allocated an additional 743.5 hours to supervision time. For purposes of this claim, the

"wage rate" is determined by actual rate paid. As such, KCI requests $27,895.00 for additional site supervision caused by the delay which now requires excessive project administration.

**2. Equipment**

Another compensable element of jobsite overhead are equipment costs. As a result of the delay and disruption that occurred, as discussed in the Entitlement section, KCI was required to continue to dedicate equipment resources to the project beyond the amount of time anticipated. These costs would not have occurred had the work been completed as reasonably anticipated.

F.A.R. 31.105 (d) states:

> "(2)(i) Allowable ownership and operating costs shall be determined as follows:
>
> (A) Actual cost data shall be used when such data can be determined for both ownership and operations costs for each piece of equipment, from the contractor's accounting records. When such costs cannot be so determined. When such costs cannot be so determined... use of a particular schedule of predetermined rates or any part thereof to determine ownership and operating costs of construction equipment.
>
> (ii) Reasonable costs of renting construction equipment are allowable.
>
> (A) Costs, such as maintenance and minor running repairs incident to operating such rented equipment, that are not included in the rental rate are allowable.
>
> (4) Rental and any other costs... incurred in acquiring temporary use of land, structures, and facilities are allowable."

The calculation for increased site equipment overhead is based on the principle of increased allocation due to time. Site equipment costs increase due to a necessary extension of time. These costs would have been avoided had the project completed as originally scheduled. Due to the project delays, KCI was required to dedicate equipment and site facilities to the project for a longer period that it had anticipated, as its completion date has shifted further out into time.

The costs below have been calculated based upon reasonable costs as set out in the CalTrans Contractors Equipment Cost Guide and/or costs quoted by US Rentals, and verified by KCI. They have been calculated by a daily rate. (Exhibit "48"):

| EXTENDED EQUIPMENT COSTS | |
|---|---|
| Extended Equipment Costs | $24,588.00 |
| Overhead 23.00% | $5,655.24 |
| **Subtotal** | **$30,243.24** |
| Markup 5% | $1,512.16 |
| **Total** | **$31,755.40** |

Based upon the foregoing, KCI requests $31,756.00 for extended equipment costs caused by the delays which required maintaining the job site overhead for an additional 329 days.

## C. Increased Labor Costs

When delays extend contract performance time and result in a change of the subcontractor's schedule, the result is a decrease of the contractor's labor efficiency, which in turn increased the costs of the contractor's performance. Lost productivity shifts a contractor's schedule and planned performance from an operation organized to maximize production, to a "hurry-and-wait" process. This inefficiency often has substantial detrimental effects on the labor force, such as that which KCI has suffered on Phase III.

### 1. Extended Maintenance

The original schedule for the landscaping work on Phase III was for the work to be completed within the duration of July 28, 1997 to January 4, 1998. However, as discussed previously, this did not occur. Instead, the work did not reach substantial completion until August 18, 1998. The extended maintenance cost ratio is a function of time that changes with

the delay duration affecting the amount of labor necessary to provide additional and/or extended maintenance.

KCI anticipated dedicating 1,560 hours to maintenance on this project. Yet, due to the delay and disruption impacts incurred on this job, KCI had dedicated a total of 12,199 hours to maintenance, for a total of an additional 10,639 hours (Exhibit "49"). These numbers are based upon certified payroll, as allocated by the dailys and verified by KCI.

As seen in the following table, at a wage rate $22.01, which includes fringe benefits, KCI has dedicated an additional $234,164.39 to the maintenance labor hours of this project. After 16.2% burden, contract markup of 23%, and 5% markup, KCI has incurred an additional $351,415.89 in costs due to increased Maintenance.

| MAINTENANCE INEFFICIENCY | |
|---|---|
| | **Maintenance** |
| As-Bid | $1,560.00 |
| Actual | $12,199.00 |
| **Subtotal** | **$10,639.00** |
| Wage rate (base & fringe) | $22.01 |
| **Subtotal** | **$234,164.39** |
| 16.2% Burden | $37,934.63 |
| **Subtotal** | **$272,099.02** |
| 23% Overhead | $62,582.77 |
| **Subtotal** | **$334,681.80** |
| 5% Markup | $16,734.09 |
| **Subtotal** | **$351,415.89** |

KCI requests the recovery of $351,416.00 for all additional maintenance hours dedicated to the completion of Phase III landscaping.

**2. Maintenance Wage Classification Increase**

KCI was forced to reclassify its landscaping maintenance tradesmen to "landscape laborer," a higher wage rate classification, despite the fact that KCI had maintained the previous classification through the Phase II projects. As a result, KCI bid its hours at the lower wage rate classification, and has had to incur a significant increase in labor costs. KCI had bid 1,560 hours for maintenance at the $11.67 per hour wage rate ($8.62 + $3.05 fringe benefits; excluding burden, overhead and markup). Instead, KCI has had to pay its maintenance tradesman at the $22.01 per hour wage rate ($13.40 + $8.61 fringe benefits), an increase of $10.34 per hour.

As seen in the following table, KCI has had to dedicate an additional $24,207.26 in all of its original bid maintenance hours.

| WAGE CLASSIFICATION INCREASE | |
|---|---|
| Landscape Maintenance Tradesman | $11.67 |
| Landscape Laborer | $22.01 |
| Difference | $10.34 |
| As-Bid Hours | $1,560.00 |
| **Subtotal** | **$16,130.40** |
| 16.2% Burden | $2,613.12 |
| **Subtotal** | **$18,743.52** |
| 23% Overhead | $4,311.01 |
| **Subtotal** | **$23,054.54** |
| 5% Markup | $1,152.73 |
| **Total** | **$24,207.26** |

KCI now requests an additional $24,208.00 in increased wages due to unreasonable reclassification of "tradesman" by the Government.

### 3. Impacts And Disruption - Irrigation And Landscaping Labor Inefficiency

Often, the cost of labor is disrupted when a change occurs to the planned performance. When work is performed in less productive periods, its effects are felt on parts of the work not directly changed, but yet, adversely affected by the impact of the change. Equitable adjustment granted under the changes clause of a federal contract is not limited to the increased costs of the specific changed work:

> "It is well established that the increased cost of disrupted unchanged work flowing directly from a change . . . is compensable under the changes clause; the Rice Doctrine is long dead. See Luria Brothers & Co. v. United States, 177 Ct.Cl. 676, 369 F.2d 701 (1966); Paul Hardeman, Inc. v. United States, 186 Ct.Cl. 743, 406 F.2d 1357 (1969); Merritt-Chapman & Scott Corp. v. United States, 192 Ct.Cl. 851, 429 F.2d 431 (1970). Claims for the costs of cumulative impact, 'the impact on unchanged work which is not attributable to any one change but flows from the synergy of the number and scope of changes issued on a project' are well recognized by the courts and boards of contract appeals."

*McMillin Bros. Constructors, Inc.* EBCA No. 238-10-84, 91-1 B.C.A. (CCH) ¶23,351 at 117,102 (1990) (citing Fruehauf Corp., PSBCA No. 477, 74-1 B.C.A. (CCH) ¶10,596 (1974); *Bechtel Nat'l. Inc.*, NASABCA No. 1186-7, 90-1 B.C.A. (CCH) ¶22,549 (1989)

KCI's crews have suffered a decrease in its labor productivity due to the delays and disruptions that have occurred on this project, as discussed in the Entitlement Section. As seen below, KCI bid this project, based upon the conditions presented at bid time, with the intent to spend 4,322 hours on irrigation and 5,640 hours on landscaping (Maintenance hours have been discussed in the two preceding divisions).

Yet, due to the causes previously discussed, KCI dedicated 4,704 hours to irrigation and 10,244 hours to landscaping (Exhibit "49"). Calculated on an average wage rate of $24.00, then multiplied by 16.2% burden, overhead of 23%, and a basic markup of 5%, KCI has incurred an additional $179,582.52 in costs, as seen in the table below:

| INCREASE DUE TO PROJECT IMPACTS | | | |
|---|---|---|---|
| | **Irrigation** | **Landscaping** | **Total** |
| As-Bid | $4,322.00 | $5,640.00 | $9,962.00 |
| Actual | $4,704.00 | $10,244.00 | $14,948.00 |
| **Subtotal** | **$382.00** | **$4,604.00** | **$4,986.00** |
| Wage rate | $24.00 | $24.00 | $24.00 |
| **Subtotal** | **$9,168.00** | **$110,496.00** | **$119,664.00** |
| 16.2% Burden | $1,485.22 | $17,900.35 | $19,385.57 |
| **Subtotal** | **$10,653.22** | **$128,396.35** | **$139,049.57** |
| 23% Markup | $655.17 | $7,896.38 | $8,551.55 |
| **Total** | **$13,758.63** | **$165,823.89** | **$179,582.52** |

KCI now requests the recovery of all additional irrigation and landscaping labor hours due to the negative impacts suffered on this project, for a total of $179,583.00.

**D. Consulting Costs**

KCI has incurred consultant costs in the administration to complete this project. These costs are strictly the result of necessary development of this proposal for submission to Harper/Nielson and the Government. F.A.R. 31.205-33 defines Professional and Consultant Service Costs as:

> "Consulting costs are defined as costs for persons who are members of a particular professions or possess a special skill who are not officers or employee of the contractor... Professional and consultant services are generally acquired to obtain information, advice, opinion, alternatives, conclusions, recommendations, training, or direct assistance, such as studies, analyses, evaluations, liaison with the Government officials, or other forms of representation."
>
> (b) Costs of professional and consultant services are allowable when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government."

The costs need to meet specific criteria to be (1) allocable and (2) allowable to the contract such as F.A.R. 31.205-33:

> "(d.2) The necessity of contracting for the service, considering the contractor's capability in the particular area.
>
> (d.3) The past pattern of acquiring such services and their costs.
>
> (d.5) Whether the service can be performed more economically by employment rather than contracting."

KCI has utilized the services of an outside consultant to prepare its costs proposal, which are valid costs associated with change work:

| PROPOSAL PREPARATION COSTS | |
|---|---|
| ADR consulting, Inc.[1] | $30,000.00 |

KCI requests $30,000.00 for the preparation costs of this equitable adjustment.

## VI. Damage Recap

| SUMMARY OF ALL DAMAGES | |
|---|---|
| HOME OFFICE OVERHEAD IMPACT | $125,707.00 |
| EXTENDED GENERAL CONDITIONS | |
| Site Administration | $27,895.00 |
| Equipment | $31,756.00 |
| INCREASED LABOR COSTS | |
| Extended Maintenance | $351,416.00 |
| Classification Increase | $24,208.00 |
| Irrigation & Landscaping | $179,583.00 |
| PROPOSAL PREPARATION COSTS | $30,000.00 |
| **TOTAL** | **$770,565.00** |

KCI dedicated additional resources on the project for landscaping work during completion of its contractual obligation, which includes an increased performance in time. KCI

associates these damages with the significant number of delays and disruptions that occurred on this job. Therefore, KCI makes a request in the amount of $770,565.00 for damages due to project impacts and retentions.

# CONTRACTOR'S CERTIFICATION

Harper/Nielson-Dillingham hereby certifies that the claim is made in good faith; that the supporting data are accurate and complete to the best of their knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor understands the government is liable; and that the following persons are duly authorized to certify the claim on behalf of the contractor.

HARPER/NIELSON-DILLINGHAM

[signature]

Print Name: Ronald D. Harper
Its: Managing Partner

STATE OF CALIFORNIA )
) ss:
COUNTY OF SAN DIEGO )

Now on this 25th day of July, 2003, before me, a notary public, personally appeared Ronald D. Harper, who, being first duly sworn, did state that he is the Managing Partner of Harper/Nielson-Dillingham, that he is authorized to execute the foregoing and that he executed the same on behalf of Harper/Nielson-Dillingham.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year last above written.

[signature]
Notary Public

My commission expires:

March 1, 2006

MYRNA SMITH
Commission # 1344861
Notary Public - California
San Diego County
My Comm. Expires Mar 1, 2006

## CONTRACTOR'S CERTIFICATION

Karleskint-Crum, Inc. hereby certifies that the claim is made in good faith; that the supporting data are accurate and complete to the best of their knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and that the following persons are duly authorized to certify the claim on behalf of the contractor.

KARLESKINT-CRUM, INC.

[signature]

Print Name: Curt Boutwell
Its: General Manager

STATE OF CALIFORNIA )
) ss:
COUNTY OF ____________)

Now on this 28TH day of July, 2003, before me, a notary public, personally appeared CURT BOUTWELL, who, being first duly sworn, did state that he is the GENERAL MGR of Karleskint-Crum, Inc., that he is authorized to execute the foregoing and that he executed the same on behalf of Karleskint-Crum, Inc.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal the day and year last above written.

[signature: Janice Canon]
Notary Public

My commission expires:

3-4-05

F:\DATA\WPWIN\1645\02\docs\certification-kci.doc

JANICE CANON
Commission # 1296005
Notary Public - California
San Luis Obispo County
My Comm. Expires Mar 4, 2005

# CONTRACTOR'S DAILY PROGRESS REPORT

| CONTRACT NO. | TITLE & LOCATION | REPORT # |
|---|---|---|
| F046484-96-C-0046 | REPLACE CAPEHART MFH **PHASE 3** (143 UNITS) | 200 |

| CONTRACTOR: | PROJECT MANAGER | DATE: 7/28/97 |
|---|---|---|
| HARPER/NIELSEN-DILLINGHAM BUILDERS JOINT VENTURE | JEFF HARPER | DAY: MONDAY |

| PRIME CONTRACTOR SUBCONTRACTOR | NO. MEN | NO. OF HOURS | CLASS/ TRADE | DESCRIPTION OF WORK |
|---|---|---|---|---|
| HARPER/NIELSEN-DILLINGHAM | 5 | 40.0 | GENERAL CONTRACTOR | GENERAL CONTRACTOR |
| JOHN P. DONOVAN | 0 | 0.0 | MASON | GRADING AND CONCRETE |
| | 1 | 8.0 | LABORER | |
| | 1 | 8.0 | OPERATOR | |
| | 0 | 0.0 | IRONWORKER | |
| R.P. RICHARDS | 16 | 128.0 | PLUMBER - JOURNEYMAN | SEWER/WATER/GAS |
| | 6 | 48.0 | PLUMBER - APPRENTICE | |
| | 4 | 32.0 | SHEETMETAL - JOURNEYMAN | HVAC |
| | 2 | 16.0 | SHEETMETAL - APPRENTICE | |
| | 3 | 22.0 | INSULATOR -JOURNEYMAN | |
| | 0 | 0.0 | INSULATOR -APPRENTICE | |
| SMITH ELECTRIC | 4 | 29.0 | UG ELEC - JOURNEYMAN | ELECTRICAL |
| | 1 | 9.0 | UG ELEC- APPRENTICE | |
| | 18 | 160.0 | BLDG ELEC -JOURNEYMAN | |
| | 8 | 66.0 | BLDG ELEC - APPRENTICE | |
| | 0 | 0.0 | OPERATOR | |
| TONE FRAMING | 71 | 648.0 | CARPENTER | FRAMING |
| ARENA PAINTING | 5 | 40.0 | JOURNEYMEN PAINTER | PAINTERS |
| | 5 | 40.0 | APPRENTICE PAINTER | |
| JR BARTO | 1 | 8.0 | SHEETMETAL JOURNEYMAN | SHEETMETAL |
| | 1 | 8.0 | LABORER | |
| ALL AMERICAN ROOFING | 8 | 56.0 | ROOFER | ROOFING |
| COFFMAN ENTERPRISES | 13 | 130.0 | LATHER | EXTERIOR STUCCO |
| | 18 | 162.0 | PLASTERER | |
| | 8 | 72.0 | PLASTER TENDERER | |
| | 6 | 57.0 | LABORER | |
| PROCRAFT | 4 | 32.0 | FINISH CARPENTER | FINISH CARPENTRY |
| GLASS WIZARD | 5 | 25.0 | LABORER | WINDOW INSTALLATION |
| SCHMID INSULATION | 2 | 16.0 | CARPENTER -INSULATION | INSULATION |
| ALL STATES DRYWALL | 9 | 72.0 | DRYWALL INSTALLER | DRYWALL |
| | 9 | 72.0 | FINISHER | |
| | 1 | 8.0 | LABORER | |
| WALKER WOOD | 5 | 30.0 | CARPENTER | CABINET INSTALLATION |
| MICHAEL'S CUSTOM TILE | 3 | 24.0 | TILESETTER | CERAMIC TILE |
| | 1 | 8.0 | TILE FINISHER | |
| SANTORI WOODWORKING | 0 | 0.0 | CARPENTER | COUNTERTOPS |
| **TOTAL EMPLOYEES:** | **244** | | | |
| **TOTAL WORK HOURS ON JOB SITE THIS DATE** | | | **2,074.0** | |
| **CUMULATIVE TOTAL OF WORK HOURS FROM PREVIOUS REPORT** | | | **86,246.5** | |
| **TOTAL WORK HOURS FROM START OF CONSTRUCTION** | | | **88,320.5** | **88320.5** |

PARKE EWING, SUPERINTENDENT

7/28/97
DATE

# CONTRACTOR'S DAILY PROGRESS REPORT

| CONTRACT NO. | TITLE & LOCATION | REPORT # |
|---|---|---|
| F046484-96-C-0046 | REPLACE CAPEHART MFH **PHASE 3** (143 UNITS) | 201 |

| CONTRACTOR: | PROJECT MANAGER | DATE: 7/29/97 |
|---|---|---|
| HARPER/NIELSEN-DILLINGHAM BUILDERS JOINT VENTURE | JEFF HARPER | DAY: TUESDAY |

| PRIME CONTRACTOR SUBCONTRACTOR | NO. MEN | NO. OF HOURS | CLASS/ TRADE | DESCRIPTION OF WORK |
|---|---|---|---|---|
| HARPER/NIELSEN-DILLINGHAM | 5 | 40.0 | GENERAL CONTRACTOR | GENERAL CONTRACTOR |
| JOHN P. DONOVAN | 0 | 0.0 | MASON | GRADING AND CONCRETE |
| | 1 | 8.0 | LABORER | |
| | 2 | 16.0 | OPERATOR | |
| | 0 | 0.0 | IRONWORKER | |
| R.P. RICHARDS | 17 | 136.0 | PLUMBER - JOURNEYMAN | SEWER/WATER/GAS |
| | 7 | 56.0 | PLUMBER - APPRENTICE | |
| | 0 | 0.0 | SHEETMETAL - JOURNEYMAN | HVAC |
| | 0 | 0.0 | SHEETMETAL - APPRENTICE | |
| | 0 | 0.0 | INSULATOR -JOURNEYMAN | |
| | 0 | 0.0 | INSULATOR -APPRENTICE | |
| SMITH ELECTRIC | 5 | 40.0 | UG ELEC - JOURNEYMAN | ELECTRICAL |
| | 1 | 9.0 | UG ELEC- APPRENTICE | |
| | 15 | 133.0 | BLDG ELEC -JOURNEYMAN | |
| | 7 | 63.0 | BLDG ELEC - APPRENTICE | |
| | 0 | 0.0 | OPERATOR | |
| TONE FRAMING | 74 | 715.0 | CARPENTER | FRAMING |
| ARENA PAINTING | 5 | 40.0 | JOURNEYMEN PAINTER | PAINTERS |
| | 5 | 40.0 | APPRENTICE PAINTER | |
| JR BARTO | 1 | 8.0 | SHEETMETAL JOURNEYMAN | SHEETMETAL |
| | 1 | 8.0 | LABORER | |
| ALL AMERICAN ROOFING | 8 | 64.0 | ROOFER | ROOFING |
| COFFMAN ENTERPRISES | 13 | 130.0 | LATHER | EXTERIOR STUCCO |
| | 18 | 163.0 | PLASTERER | |
| | 8 | 72.0 | PLASTER TENDERER | |
| | 6 | 57.0 | LABORER | |
| PROCRAFT | 4 | 32.5 | FINISH CARPENTER | FINISH CARPENTRY |
| GLASS WIZARD | 5 | 25.0 | LABORER | WINDOW INSTALLATION |
| SCHMID INSULATION | 2 | 16.0 | CARPENTER -INSULATION | INSULATION |
| ALL STATES DRYWALL | 11 | 88.0 | DRYWALL INSTALLER | DRYWALL |
| | 8 | 64.0 | FINISHER | |
| | 1 | 8.0 | LABORER | |
| WALKER WOOD | 4 | 21.5 | CARPENTER | CABINET INSTALLATION |
| MICHAEL'S CUSTOM TILE | 3 | 24.5 | TILESETTER | CERAMIC TILE |
| | 1 | 8.5 | TILE FINISHER | |
| SANTORI WOODWORKING | 3 | 24.0 | CARPENTER | COUNTERTOPS |
| **TOTAL EMPLOYEES:** | **241** | | | |

| | | |
|---|---|---|
| **TOTAL WORK HOURS ON JOB SITE THIS DATE** | **2,110.0** | |
| **CUMULATIVE TOTAL OF WORK HOURS FROM PREVIOUS REPORT** | **88,320.5** | |
| **TOTAL WORK HOURS FROM START OF CONSTRUCTION** | **90,430.5** | **90430.5** |

[signature]

PARKE EWING, SUPERINTENDENT

7/29/97

DATE

# CONTRACTOR'S DAILY PROGRESS REPORT

| CONTRACT NO. | TITLE & LOCATION | REPORT # |
|---|---|---|
| F046484-96-C-0046 | REPLACE CAPEHART MFH **PHASE 3** (143 UNITS) | 202 |

| CONTRACTOR: | PROJECT MANAGER | DATE: 7/30/97 |
|---|---|---|
| HARPER/NIELSEN-DILLINGHAM BUILDERS JOINT VENTURE | JEFF HARPER | DAY: WEDNESDAY |

| PRIME CONTRACTOR SUBCONTRACTOR | NO. MEN | NO. OF HOURS | CLASS/ TRADE | DESCRIPTION OF WORK |
|---|---|---|---|---|
| HARPER/NIELSEN-DILLINGHAM | 5 | 40.0 | GENERAL CONTRACTOR | GENERAL CONTRACTOR |
| JOHN P. DONOVAN | 1 | 8.0 | MASON | GRADING AND CONCRETE |
| | 2 | 16.0 | LABORER | |
| | 1 | 8.0 | OPERATOR | |
| | 0 | 0.0 | IRONWORKER | |
| R.P. RICHARDS | 16 | 124.0 | PLUMBER - JOURNEYMAN | SEWER/WATER/GAS |
| | 6 | 44.0 | PLUMBER - APPRENTICE | |
| | 5 | 40.0 | SHEETMETAL - JOURNEYMAN | HVAC |
| | 2 | 16.0 | SHEETMETAL - APPRENTICE | |
| | 2 | 12.0 | INSULATOR -JOURNEYMAN | |
| | 1 | 1.0 | INSULATOR -APPRENTICE | |
| SMITH ELECTRIC | 5 | 45.5 | UG ELEC - JOURNEYMAN | ELECTRICAL |
| | 1 | 9.0 | UG ELEC- APPRENTICE | |
| | 14 | 120.5 | BLDG ELEC -JOURNEYMAN | |
| | 7 | 63.0 | BLDG ELEC - APPRENTICE | |
| | 0 | 0.0 | OPERATOR | |
| TONE FRAMING | 75 | 729.5 | CARPENTER | FRAMING |
| ARENA PAINTING | 5 | 40.0 | JOURNEYMEN PAINTER | PAINTERS |
| | 5 | 40.0 | APPRENTICE PAINTER | |
| JR BARTO | 1 | 8.0 | SHEETMETAL JOURNEYMAN | SHEETMETAL |
| | 1 | 8.0 | LABORER | |
| ALL AMERICAN ROOFING | 8 | 64.0 | ROOFER | ROOFING |
| COFFMAN ENTERPRISES | 13 | 130.0 | LATHER | EXTERIOR STUCCO |
| | 18 | 163.0 | PLASTERER | |
| | 8 | 72.0 | PLASTER TENDERER | |
| | 7 | 65.0 | LABORER | |
| PROCRAFT | 5 | 41.5 | FINISH CARPENTER | FINISH CARPENTRY |
| GLASS WIZARD | 5 | 25.0 | LABORER | WINDOW INSTALLATION |
| SCHMID INSULATION | 2 | 16.0 | CARPENTER -INSULATION | INSULATION |
| ALL STATES DRYWALL | 11 | 88.0 | DRYWALL INSTALLER | DRYWALL |
| | 9 | 72.0 | FINISHER | |
| | 1 | 8.0 | LABORER | |
| WALKER WOOD | 0 | 0.0 | CARPENTER | CABINET INSTALLATION |
| MICHAEL'S CUSTOM TILE | 3 | 24.5 | TILESETTER | CERAMIC TILE |
| | 0 | 0.0 | TILE FINISHER | |
| SANTORI WOODWORKING | 3 | 19.0 | CARPENTER | COUNTERTOPS |
| LI METAL SYSTEMS | 4 | 32.0 | SHEETMETAL | GUTTERS & DOWNSPOUTS |
| **TOTAL EMPLOYEES:** | **252** | | | |

| | | |
|---|---|---|
| **TOTAL WORK HOURS ON JOB SITE THIS DATE** | **2,192.5** | |
| **CUMULATIVE TOTAL OF WORK HOURS FROM PREVIOUS REPORT** | **90,430.5** | |
| **TOTAL WORK HOURS FROM START OF CONSTRUCTION** | **92,623.0** | **92623.0** |

(signature)

PARKE EWING, SUPERINTENDENT

7/30/97

DATE

# CONTRACT[illegible]S DAILY PROGR[illegible] REPORT

| CONTRACT NO. | TITLE & LOCATION | REPORT # |
|---|---|---|
| F046484-96-C-0046 | REPLACE CAPEHART MFH **PHASE 3** (143 UNITS) | 203 |

| CONTRACTOR: | PROJECT MANAGER | DATE: 7/31/97 |
|---|---|---|
| HARPER/NIELSEN-DILLINGHAM BUILDERS JOINT VENTURE | JEFF HARPER | DAY: THURSDAY |

| PRIME CONTRACTOR SUBCONTRACTOR | NO. MEN | NO. OF HOURS | CLASS/ TRADE | DESCRIPTION OF WORK |
|---|---|---|---|---|
| HARPER/NIELSEN-DILLINGHAM | 5 | 40.0 | GENERAL CONTRACTOR | GENERAL CONTRACTOR |
| JOHN P. DONOVAN | 3 | 6.0 | MASON | GRADING AND CONCRETE |
| | 3 | 15.0 | LABORER | |
| | 4 | 24.0 | OPERATOR | |
| | 0 | 0.0 | IRONWORKER | |
| R.P. RICHARDS | 11 | 88.0 | PLUMBER - JOURNEYMAN | SEWER/WATER/GAS |
| | 4 | 32.0 | PLUMBER - APPRENTICE | |
| | 3 | 24.0 | SHEETMETAL - JOURNEYMAN | HVAC |
| | 0 | 0.0 | SHEETMETAL - APPRENTICE | |
| | 1 | 10.0 | INSULATOR -JOURNEYMAN | |
| | 0 | 0.0 | INSULATOR -APPRENTICE | |
| SMITH ELECTRIC | 5 | 40.0 | UG ELEC - JOURNEYMAN | ELECTRICAL |
| | 1 | 9.0 | UG ELEC- APPRENTICE | |
| | 14 | 121.0 | BLDG ELEC -JOURNEYMAN | |
| | 7 | 63.0 | BLDG ELEC - APPRENTICE | |
| | 1 | 4.0 | OPERATOR | |
| TONE FRAMING | 73 | 656.5 | CARPENTER | FRAMING |
| ARENA PAINTING | 5 | 40.0 | JOURNEYMEN PAINTER | PAINTERS |
| | 5 | 40.0 | APPRENTICE PAINTER | |
| JR BARTO | 1 | 8.0 | SHEETMETAL JOURNEYMAN | SHEETMETAL |
| | 1 | 8.0 | LABORER | |
| ALL AMERICAN ROOFING | 9 | 72.0 | ROOFER | ROOFING |
| COFFMAN ENTERPRISES | 12 | 120.0 | LATHER | EXTERIOR STUCCO |
| | 18 | 154.0 | PLASTERER | |
| | 8 | 72.0 | PLASTER TENDERER | |
| | 7 | 66.0 | LABORER | |
| PROCRAFT | 5 | 41.0 | FINISH CARPENTER | FINISH CARPENTRY |
| GLASS WIZARD | 5 | 25.0 | LABORER | WINDOW INSTALLATION |
| SCHMID INSULATION | 2 | 16.0 | CARPENTER -INSULATION | INSULATION |
| ALL STATES DRYWALL | 10 | 80.0 | DRYWALL INSTALLER | DRYWALL |
| | 7 | 56.0 | FINISHER | |
| | 1 | 8.0 | LABORER | |
| WALKER WOOD | 4 | 20.0 | CARPENTER | CABINET INSTALLATION |
| MICHAEL'S CUSTOM TILE | 3 | 24.5 | TILESETTER | CERAMIC TILE |
| | 0 | 0.0 | TILE FINISHER | |
| SANTORI WOODWORKING | 3 | 20.0 | CARPENTER | COUNTERTOPS |
| LI METAL SYSTEMS | 4 | 32.0 | SHEETMETAL | GUTTERS & DOWNSPOUTS |
| **TOTAL EMPLOYEES:** | **245** | | | |

| | | |
|---|---|---|
| **TOTAL WORK HOURS ON JOB SITE THIS DATE** | 2,035.0 | |
| **CUMULATIVE TOTAL OF WORK HOURS FROM PREVIOUS REPORT** | 92,623.0 | |
| **TOTAL WORK HOURS FROM START OF CONSTRUCTION** | 94,658.0 | **94658.0** |

PARKE EWING, SUPERINTENDENT

7/31/97
DATE

# CONTRACTOR'S DAILY PROGRESS REPORT

| | | |
|---|---|---|
| CONTRACT NO.<br>F046484-96-C-0046 | TITLE & LOCATION<br>REPLACE CAPEHART MFH **PHASE 3** (143 UNITS) | REPORT #<br>204 |
| CONTRACTOR:<br>HARPER/NIELSEN-DILLINGHAM BUILDERS JOINT VENTURE | PROJECT MANAGER<br>JEFF HARPER | DATE: 8/1/97<br>DAY: FRIDAY |

| PRIME CONTRACTOR SUBCONTRACTOR | NO. MEN | NO. OF HOURS | CLASS/ TRADE | DESCRIPTION OF WORK |
|---|---|---|---|---|
| HARPER/NIELSEN-DILLINGHAM | 5 | 40.0 | GENERAL CONTRACTOR | GENERAL CONTRACTOR |
| JOHN P. DONOVAN | 3 | 16.0 | MASON | GRADING AND CONCRETE |
| | 4 | 20.0 | LABORER | |
| | 1 | 8.0 | OPERATOR | |
| | 0 | 0.0 | IRONWORKER | |
| R.P. RICHARDS | 9 | 72.0 | PLUMBER - JOURNEYMAN | SEWER/WATER/GAS |
| | 2 | 16.0 | PLUMBER - APPRENTICE | |
| | 3 | 21.0 | SHEETMETAL - JOURNEYMAN | HVAC |
| | 0 | 0.0 | SHEETMETAL - APPRENTICE | |
| | 0 | 0.0 | INSULATOR -JOURNEYMAN | |
| | 0 | 0.0 | INSULATOR -APPRENTICE | |
| SMITH ELECTRIC | 5 | 40.0 | UG ELEC - JOURNEYMAN | ELECTRICAL |
| | 1 | 9.0 | UG ELEC- APPRENTICE | |
| | 14 | 110.0 | BLDG ELEC -JOURNEYMAN | |
| | 9 | 69.5 | BLDG ELEC - APPRENTICE | |
| | 1 | 4.0 | OPERATOR | |
| TONE FRAMING | 20 | 127.0 | CARPENTER | FRAMING |
| ARENA PAINTING | 5 | 40.0 | JOURNEYMEN PAINTER | PAINTERS |
| | 5 | 40.0 | APPRENTICE PAINTER | |
| JR BARTO | 1 | 4.0 | SHEETMETAL JOURNEYMAN | SHEETMETAL |
| | 0 | 0.0 | LABORER | |
| ALL AMERICAN ROOFING | 7 | 56.0 | ROOFER | ROOFING |
| COFFMAN ENTERPRISES | 0 | 0.0 | LATHER | EXTERIOR STUCCO |
| | 19 | 76.0 | PLASTERER | |
| | 6 | 24.0 | PLASTER TENDERER | |
| | 4 | 16.0 | LABORER | |
| PROCRAFT | 3 | 24.0 | FINISH CARPENTER | FINISH CARPENTRY |
| GLASS WIZARD | 5 | 25.0 | LABORER | WINDOW INSTALLATION |
| SCHMID INSULATION | 2 | 16.0 | CARPENTER -INSULATION | INSULATION |
| ALL STATES DRYWALL | 10 | 80.0 | DRYWALL INSTALLER | DRYWALL |
| | 5 | 40.0 | FINISHER | |
| | 1 | 8.0 | LABORER | |
| WALKER WOOD | 2 | 14.0 | CARPENTER | CABINET INSTALLATION |
| MICHAEL'S CUSTOM TILE | 0 | 0.0 | TILESETTER | CERAMIC TILE |
| | 0 | 0.0 | TILE FINISHER | |
| SANTORI WOODWORKING | 2 | 14.0 | CARPENTER | COUNTERTOPS |
| LI METAL SYSTEMS | 0 | 0.0 | SHEETMETAL | GUTTERS & DOWNSPOUTS |
| **TOTAL EMPLOYEES:** | **154** | | | |

| | | |
|---|---|---|
| **TOTAL WORK HOURS ON JOB SITE THIS DATE** | **1,029.5** | |
| **CUMULATIVE TOTAL OF WORK HOURS FROM PREVIOUS REPORT** | **94,658.0** | |
| **TOTAL WORK HOURS FROM START OF CONSTRUCTION** | **95,687.5** | **95687.5** |

PARKE EWING, SUPERINTENDENT

8/1/97
DATE